[Civ. No. 48368. Second Dist., Div. Three. Apr. 27, 1977.]

ALEX JACOBSON et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents;
CURTIS PILZ et al., Interveners and Respondents.

**COUNSEL**

Trabish, Caplan & Peterson, Trabish & Caplan and David L. Caplan for Plaintiffs and Appellants.

John H. Larson, County Counsel, and Charles J. Moore, Deputy County Counsel, for Defendants and Respondents.

Eugene Parks for Interveners and Respondents.

**OPINION**

**POTTER, J.**—This is an appeal from a judgment denying a peremptory writ of mandate in an administrative mandamus proceeding to review the action of respondents, the Regional Planning Commission and the Board of Supervisors of the County of Los Angeles, granting a conditional use permit authorizing construction, operation and maintenance of a tennis club with a clubhouse, tennis courts, swimming pool and appurtenant facilities upon land in zone A-1-1 (light agriculture—one acre minimum required area) in the Topanga Canyon area.

The uses authorized in zone A-1 without a conditional use permit included residences, crops, day care for children, homes for aged persons, and such light agricultural uses as breeding farms for cattle or horses, the grazing of cattle, horses, sheep or goats, the raising of poultry, fowl, birds, rabbits, etc., and the keeping of hogs or pigs under specified conditions. (Los Angeles County Zoning Ord. § 233.)

Section 233.3 of the ordinance specified some 57 additional uses which were permitted "provided a conditional use permit has first been obtained." These included a wide variety of commercial uses such as airports, hospitals, riding academies, rifle, pistol or skeet ranges, and "(41) Recreation clubs, including tennis, polo, swimming," as well as numerous public uses such as police and fire stations, sewage treatment plants, and other "[p]ublicly owned uses necessary to the maintenance of the public health, convenience, or general welfare . . . ."

Section 233.3 specified that conditional use permits be obtained as provided in article 1, chapter 5 of the zoning ordinance. The applicable section 501.9, in chapter 5, specified the conditions under which a conditional use permit might be granted as follows:

"The Zoning Board may recommend approval and the Commission may approve an application for a conditional use permit where the information submitted by the applicant and/or presented at public hearing substantiates the following findings:

"(a) That the proposed use will not be in substantial conflict with the adopted general plan for the area. Where no general plan has been adopted, this subsection shall not apply.

"(b) That the requested use at the location proposed will not:

"(1) Adversely affect the health, peace, comfort or welfare of persons residing or working in the surrounding area, or

"(2) Be materially detrimental to the use, enjoyment or valuation of property of other persons located in the vicinity of the site, or

"(3) Jeopardize, endanger or otherwise constitute a menace to the public health, safety or general welfare, and

"(c) That the proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping and other development features prescribed in this Ordinance, or as is otherwise required in order to integrate said use with the uses in the surrounding area, and

"(d) That the proposed site is adequately served:

"(1) By highways or streets of sufficient width and improved as necessary to carry the kind and quantity of traffic such use would generate, and

"(2) By other public or private service facilities as are required.

"The Commission shall deny the application where the information submitted by the applicant and/or presented at public hearing fails to substantiate such findings to the satisfaction of the Commission."

At the time the conditional use permit was granted the property, comprising some 12 acres with frontage on Old Topanga Canyon Road near Mulholland Drive, was owned by real parties in interest Jack and Marguerite Scott. Thereafter, and prior to the filing of the petition for writ of mandate, it was acquired by real parties in interest Curtis and Coye Jean Pilz. Petitioners Alex and Roberta Jocobson are, and at all material times have been, owners of real property, comprising their home located approximately 600 feet from the property owned by real parties in interest.

The conditional use permit was applied for by the Scotts on March 22, 1974. It described the property and declared under penalty of perjury "that the information accompanying this application is true." Included in the information so verified were the following statements:

"The proposed Tennis Court Complex will not adversely affect the health, peace, comfort or welfare of persons residing or working in the surrounding area, or be materially detrimental to the use, enjoyment or valuation of property of other persons located in the vicinity of the site,

or jeopardize, endanger or otherwise constitute a menace to the public health, safety or general welfare.

"· . . . . . . . . . . . . . . . . .

"The proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping and other development features perscribed [*sic*] in this Ordinance, or is otherwise required in order to integrate said use with the uses in the surrounding area.

"· . . . . . . . . . . . . . . . . .

"The proposed site is adequately served by Highways or Streets of sufficient width and improved as necessary to carry the kind of and quantity of traffic such use would generate, and by other public or private services facilities as are required."

Also attached were certificates from the deputy forester and fire warden and from the manager of water operations of the local water district stating that "[a]dequate water is available for service to the property."

The matter of the application was heard by the zoning board on December 17, 1974. Prior to the date of such hearing, the applicant submitted a letter from Spindler Engineering Corporation stating in support of the application the following additional facts: (1) that the project is located in a natural canyon virtually isolated from all existing homes in the area and had been designed with sufficient setbacks from the property lines to allow for natural topographic features and landscaping to screen the project from any future development; (2) that the project would be an asset to the surrounding home owners who would be expected to become members of the tennis club; (3) that the revised plot plan demonstrates adequate area within the property for all required features and to allow for "generous landscaping and picnicing [*sic*] in the Northwest portion of the property"; (4) that sewage disposal would be provided by a public system; and (5) that existing streets were adequate, the writer having inspected other such projects and found the traffic flow to be relatively light without substantial peak periods and with any peak period not corresponding to other traffic peak periods. Also filed with the board prior to the hearing was an "ENVIRONMENTAL IMPACT QUESTIONNAIRE" completed by Spindler Engineering Corp.,

which included in the "ENVIRONMENTAL INFORMATION" statements to the effect that the area to be used for the tennis courts and parking was mostly level, that a natural water course along the east boundary would remain intact except for a road crossing, that a number of large oaks and other trees existed on the property, and all major trees were to be saved, that the animal life existing in the hilly brushy areas would not be disturbed, that no population would require relocation, that a 15,000 cubic yard grading operation was required which would be "constructed to follow the natural contour of the land," and that "[s]o far this project is supported by the local residents."

Also included in the record of the zoning board was a staff "FACTUAL DATA REPORT AND EXEMPTION DECLARATION" supported by an "ENVIRONMENTAL ASSESSMENT CHECKLIST" completed by the zoning board staff. Of some 40 items on the checklist, five were checked "not applicable," 30 were checked "no significant effect," and four were checked "significant effect." These four were "topography," "landforms (surface features)," "dust (particulates)," and "endangered & rare species." Only one of these was, however, checked with a "minus" to indicate adverse effects. That was the "dust (particulates)" item. The others were checked with a "plus" for "beneficial effects." The conclusion stated by the staff member completing the environmental assessment checklist was "This project qualifies for an exemption declaration." The staff factual data report stated 13 separate grounds for the exemption declaration, including: the receipt of a petition with 28 names in favor of the use; its consistency with the general plan; the absence of unique or significant natural features to be adversely affected; the absence of archaeological, cultural, historical, recreational or scenic sites to be adversely affected; no significant dislocation of people; no substantial detrimental effect on air or water quality or ambient noise levels for adjoining areas; no breach of national, state or local standards relating to solid waste or litter control; no substantial and demonstrable negative aesthetic effect; no hazards such as flooding, erosion or siltation; no major geological hazards; no requirement for public services beyond those presently available; no significant growth-inducing impact; and the lack of apparent major environmental controversy.

In addition, the factual data report described the project in detail, and explained that the area surrounding the property was "primarily vacant with the exception of some scattered single family residences, a horse stable and a trailer," and noted that the primary recreational use would be the tennis courts which would operate by appointment only.

Also, prior to the hearing the zoning board received a communication from the Topanga-Las Virgenes Resource Conservation District.[1] This letter stated that the tennis club would be located at the site of an old rock quarry excavated many years previously and would require a minimum of grading; that all trees would be left in place, "and this will serve to completely screen the area from Old Topanga Road"; that "[a]lthough the zoning on the property is A-1-1, it is immediately adjacent to property already in commercial use." The letter concluded that the "usage is compatible with the area."

At the hearing on December 17, 1974, a preliminary presentation was made by a member of the staff of the Regional Planning Commission. In this presentation it was stated that the subject property was vacant "as is the majority of the surrounding area" and that "[t]here is also a stable on the nearest adjacent property." The project was described as 20 tennis courts, "a clubhouse and swimming pool" with two parking areas which the staff felt were "ample to supply the use." The property was described as 12.26 acres in size which "would fall under the classification of the general plan and would fit the rural classification." In respect to environmental impact, the staff stated that the tennis courts would operate by appointment only, that all existing oak trees and natural growth would remain undisturbed on all slopes outside the grading limits. Reference was made to the exemption declaration and it was added "that the staff feels that this being a primary recreational use, it would probably have a beneficial effect on the environmental concerns of the area." It was added that although approximately 75 notices had been sent out, the staff had received "no letters in opposition to this case" and had "a petition with 28 signatures on it in favor of this case," stating that it would be an asset to the community.

The hearing progressed with testimony by the applicant's architect. This witness stated that the expected maximum attendance at one time would be 40 persons and that the hours of operation would be 8 a.m. to 11 p.m.

Real party Curtis Pilz then testified that there was "a definite need and interest in a project of this kind in the area." The next witness was Arthur Whizen, an owner of R-3 property in the neighborhood adjacent to which grading was being carried on for 240 units of condominiums. Whizen described a visit to a country club which had tennis courts open at night to observe the amount of noise. Whizen testified, "[Y]ou'd never

[1]See Public Resources Code, section 9021.

know that people were playing tennis, except for the hitting of that ball, occasionally you would hear that." Whizen concluded that "this recreational facility belongs where golf courses are in residential areas." Mr. Whizen also stated he would have no objection to liquor being sold in the club house.

The next witness was Roberta Blount representing the Topanga-Las Virgenes Resource Conservation District. This witness explained the district's reason for approving the project as "the appropriateness for the use of this particular site." She stated, "It is screened from the road by vegetation which he has said [he] will not remove." She added, "There is a definite need close to developed areas for recreation." The witness recommended that the permit require construction of the tennis courts before the clubhouse to avoid the possibility of such facility becoming a mere restaurant and requested that it be made clear that there would be no motel units.

The zoning board next heard the opposition witnesses. Donn Landee testified in opposition. He submitted a petition signed by 18 residents in the area. This petition was made a part of the file and noted in the handwritten "hearing summary" which also was made a part of the file. The petition stated merely that the undersigned "are opposed to the granting of a conditional Use Permit for commercial development" of the property, without stating any factual basis for such opposition. Mr. Landee testified as a representative of those signing the petition that such opposition was based upon two factors, the allegedly unique acoustics and the lighting conditions in the canyon. He stated that "[a]ny sound that is made is audible all the way up and down the canyon" which, at present, is very quiet. He further testified that currently "no light gets into the canyon" since "[t]here are no street lights there now, for example," and the residents are "opposed to any development which will . . . light up the canyon at night."

Mr. Charles W. Smith also testified. He did not oppose the project. He wished merely to recommend that the driveway into the facility be placed at its southerly boundary so as to serve as a buffer in the event of future development on the adjoining parcel.

In rebuttal, the architect for the applicant responded to the petition in opposition by stating that the board should "consider the nature of the growth of the whole community," referring in this connection to a proposal to construct a new high school "on Mulholland of approximate-

ly 2,000 students" as indicative of "the community need for this type of project." He also referred to the increase in residential density due to the 277 residential units mentioned in the previous testimony. Upon examination by a member of the board, the architect stated that the applicant would dedicate the necessary easements to accommodate a planned realignment of Old Topanga Canyon Road.

Thereafter, the zoning board made its recommendation that the permit be granted subject to 21 conditions, including an irrevocable offer to dedicate a 40-foot right-of-way on each side of the proposed center line of proposed Old Topanga Canyon Road, that provision for natural drainage be made to the satisfaction of the county engineer, that hours of operation be limited to a period between 8 a.m. and 11 p.m., that the tennis courts be constructed first and then the rest of the development, and that the club be a closed membership facility only. The "SUMMARY OF THE HEARING" in which said recommendation was made recited that "[e]ight (8) persons were sworn, four of whom testified in favor, one in opposition, and one person as an interested observer," and summarized the testimony of the witnesses. Findings were made as follows:

"1. There was one protest to the granting of this permit.

"2. Granting the proposed conditional use permit with the conditions and restrictions hereinafter mentioned will not be in substantial conflict with any general plan adopted for the area.

"3. The requested use at the location proposed will not adversely affect the health, peace, comfort or welfare of persons residing or working in the surrounding area, and will not be materially detrimental to the use, enjoyment, or valuation of property of other persons located in the vicinity of the site, and will not jeopardize, endanger, or otherwise constitute a menace to the public health, safety or general welfare.

"4. The proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping and other development features prescribed in the Ordinance, and as is otherwise required in order to integrate said use with the uses in the surrounding area.

"5. The proposed site has adequate traffic access and said site is adequately served by other public or private service facilities which it requires.

"6. The Regional Planning Commission approves the exemption declaration and determines that the proposed project will not have a significant effect on the environment."

On January 29, 1975, the Regional Planning Commission, pursuant to such recommendation, granted the conditional use permit subject to the 21 conditions recited in the zoning board recommendation. The notice of determination recited that "[t]he project will *not* have a significant effect on the environment" and that "[a]n Exemption Declaration was filed with the County Clerk."

A timely appeal from the planning commission decision was filed by petitioners Alex and Rebecca Jacobson as the only appellants. Said appeal resulted in the planning commission decision being affirmed by the Board of Supervisors of Los Angeles County on April 22, 1975.

The original and the first amended petition for writ of administrative mandamus were brought in the name of Topanga Association for a Scenic Community, and Alex and Rebecca Jacobson. The association was described therein as "an incorporated non-profit organization composed of owners and residents of real property located in the area of the County of Los Angeles, State of California, more popularly known as Topanga Canyon." The petition named the County of Los Angeles, Los Angeles County Zoning Board, Los Angeles County Regional Planning Commission, and Los Angeles County Board of Supervisors as respondents, and Jack and Marguerite Scott (the applicants) as real parties in interest.

Two interventions were permitted. The Greater Mulwood Homeowners Association, a nonprofit tax exempt corporation representing approximately 250 home owners in an area located approximately one-half mile from the project, filed a motion to intervene in opposition to the petition for writ of mandate; it was granted. A stipulation was filed permitting Curtis and Coye Jean Pilz to intervene as real parties in interest by virtue of their purchase of the subject property from the Scotts after the board of supervisors sustained the granting of the permit.

The amended petition attacked the decision granting the conditional use permit as "a prejudicial abuse of discretion" in that (1) "there is not substantial evidence to support the findings," (2) "the decision . . . is not supported by the findings," and (3) respondents denied petitioners a fair trial in failing "to consider the objections of residents and property owners." The petition alleged petitioners' injury as follows: "18. The granting of said conditional use permit will cause substantial injury to petitioners in that, among other things, the proposed tennis club will be materially detrimental to petitioners' use, enjoyment and valuation of their property, and will adversely affect the peace of petitioners."

An answer was filed in behalf of Curtis and Coye Jean Pilz and Greater Mulwood Homeowners Association as real parties in interest, and an answer was filed by respondents County of Los Angeles, Los Angeles County Zoning Board, Los Angeles County Regional Planning Commission and Los Angeles County Board of Supervisors. Both answers denied the essential allegations of the petition; real parties also raised affirmative defenses. The answer of respondents also denied the capacity of petitioner Topanga Association for a Scenic Community to sue. At the time of trial, the association was dismissed pursuant to stipulation of counsel that petitioners had "no objection to their dismissal on that and some other grounds, procedural grounds."

The issues presented by the pleadings were submitted to the court upon the administrative record and declarations of the parties filed in support and in opposition to the petition for a writ of mandate. The declaration of petitioner Alex Jacobson declared that he lived approximately 600 feet from the borders of the tennis club and that: "The proposed tennis club will be materially detrimental to the use and enjoyment of my property in that it will bring a substantial number of people into the area surrounding my property and will greatly disturb the peace of my family. One of the main reasons we moved to Topanga Canyon was to be away from these types of projects, and rather in a residential, rural community. Because of this, we paid more for our property than we could have in other areas, and this also requires much additional traveling by automobile. The proposed tennis club, besides disturbing my peace and enjoyment of my property and causing a great additional amount of traffic in the area, will also greatly increase the noise in the area and further affect our peace and enjoyment of our property. Further, because of these reasons, the proposed tennis club will be materially detrimental to the value of our property. I would definitely leave the area if the tennis club is allowed. This means that I would have

to sell our home and give up what we consider to be a truly wonderful life style and perfect location. This would be a most grievous loss to us."

The declaration of Stephen A. Saroian, a member of the board of directors of the Greater Mulwood Homeowners Association, in charge of zoning matters, stated in opposition that: (1) "there are no county parks in the vicinity and none are planned for the foreseeable future due to budget limitations"; (2) "[t]here are no family oriented recreational facilities in the vicinity"; (3) "[t]he creation of a family oriented tennis, swimming, and social club" "within walking and bike-riding distance of our homes" "will eliminate the need of driving to remote similar facilities," "is vital for the proper development of our children and the promotion of family harmony and happiness by joint participation in recreational and social activities" and "is compatible to the present energy conservation program and ecological goals of our state and country." Saroian concluded that "[i]t is difficult to conceive as to how a recreational facility as is the project which is the subject of this litigation could have other than a positive and beneficial effect on the value of our property."

The declaration of Curtis Pilz described the Pilz' acquisition of the property through an escrow from Jack and Marguerite Scott subsequent to the board of supervisors' action denying the appeal, the payment of $76,265.41 through escrow, and an additional expenditure of $25,000 in connection with the purchase for architects, engineering fees, feasibility and legal fees, grading and construction costs and promotional expense in connection with the proposed tennis club. Said declaration further described an irrevocable dedication to the county of approximately 10 percent of the total square footage of the property acquired for the realignment of Old Topanga Canyon Road. No additional declaration was submitted in behalf of respondents.

At the hearing the various declarations were received in evidence as were portions of the administrative record designated by the parties for consideration by the court. The matter was orally argued.

At the conclusion of the argument, the court announced its intended decision to deny the peremptory writ. No findings were requested by either party, and none were made.

In its oral statement of intended decision, the court indicated that it did not find in favor of any of the affirmative defenses. The court also

was critical of the findings. Finding No. 1 was criticized as being "maybe somewhat misleading," and some of the others for failing to "sufficiently bridge the gap between the raw evidence and the decision." The court was, however, of the view that "taking all of the evidence before the court and studying it carefully and weighing all of it, it doesn't seem to me that any errors were prejudicial, that petitioners sustained substantial evidence [*sic*], or that a different result would be probable if the error had not occurred or existed." Accordingly, a judgment was entered denying the petition for peremptory writ of mandate. This appeal followed.

## Contentions

Petitioners contend: (1) "[t]here was not substantial evidence to support the required findings for the granting of a Conditional Use Permit"; (2) "[t]he Zoning Board's findings were legally insufficient upon which to base its decision approving the Conditional Use Permit"; (3) "[t]he Respondents . . . failed to give Appellants a fair trial . . . by not taking into consideration a substantial number of protests . . ."; (4) ". . . Government Code Section 65801[2] is limited to nonprejudicial, technical, procedural errors . . ." and thus does not excuse the lack of proper findings; and (5) "Respondents failed to prepare or obtain an Environmental Impact Report."

Respondents and real parties contend that petitioners have not in their briefs made any proper showing in support of their contentions one through four and that contention five is not available to them, not having been raised in the trial court.

[2]Government Code section 65801 reads as follows: "Formal rules of evidence or procedure which must be followed in court shall not be applied in zoning matters, except to the extent that a county or city may provide therefor. No action, inaction or recommendation regarding any zoning matter by any legislative body or any administrative body or official of any county or city shall be held void or invalid or be set aside by any court on the ground of the improper admission or rejection of evidence or by reason of any error, irregularity, informality, neglect or omission (hereinafter called 'error') as to any matter pertaining to petitions, applications, notices, findings, records, hearings, reports, recommendations, appeals or any matters of procedure whatever, including, but not limited to, those included in this section, unless after an examination of the entire case, including the evidence, the court shall be of the opinion that the error complained of was prejudicial, and that by reason of such error the party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error had not occurred or existed. There shall be no presumption that error is prejudicial or that injury was done if error is shown."

*Discussion*

We have examined the merits of petitioners' first four contentions and find them without merit. We conclude that petitioners' fifth contention was not raised in the trial court and is not available on this appeal.

*Substantial Evidence Supports the*
*Findings of the Zoning Board*

■ In the foregoing statement of facts, we have set forth in detail the evidence which supported the findings of the zoning board. The petitioners do not deal with this evidence in their brief except to state that "the testimony in support of the conditional use permit consisted only of a description of the facility that would operate under the conditional use permit." No fair statement of the evidence has been undertaken by petitioners.

"Here appellants have made no effort to comply with the rules of court and have failed to set forth the evidence of the matter under consideration. What is said in *Hickson* v. *Thielman,* 147 Cal.App.2d 11, 14, 15 [304 P.2d 122], is particularly appropriate: 'The first contention of defendants is that the findings are unsupported by the evidence. In this connection, we repeat what every lawyer should know, namely, that when an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.

" '. . . . Appellants have made no attempt to make a fair statement, or, indeed, anything approaching a fair statement of the evidence claimed to be insufficient. Their failure to do so will be deemed tantamount to a concession that the evidence supports the findings. [Citations.]' " (*Brown* v. *World Church,* 272 Cal.App.2d 684, 690-691 [77 Cal.Rptr. 669, 45 A.L.R.3d 622].)

Despite this omission on petitioners' part, we have examined the evidence. We find that it constitutes much more than a mere "description of the facility" and was more than sufficient to constitute substantial evidence supporting the findings required by the Los Angeles County Zoning Ordinance for the issuance of a conditional use permit.

## The Findings Were Legally Sufficient

 Petitioners' objection to the findings is based upon two assertions. The first is that the findings are objectionable because they are "couched almost exactly in the terms of the ordinance with no additional or supportive facts," and the second is, they do not "articulate the factors" upon which the decision is based so as to permit meaningful review, as required by the decision of our supreme court in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506, 516-517 [113 Cal.Rptr. 836, 522 P.2d 12]. In that case, the granting of a variance by the County of Los Angeles was invalidated on the ground that no findings were made showing the existence of circumstances authorizing a variance under the provisions of Government Code section 65906 permitting variances " *'only* when, because of *special* circumstances applicable to the property, . . . the strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification.' (Italics added.)" (11 Cal.3d at p. 520.) The court analyzed certain "factual data" in the planning commission's summary and noted (*id.,* at pp. 520-521): "The data contained in the planning commission's report focus almost exclusively on the qualities of the property for which the variance was sought. In the absence of comparative information about surrounding properties, these data lack legal significance. Thus knowledge that the property has rugged features tells us nothing about whether the original real party in interest faced difficulties different from those confronted on neighboring land. Its assurances that it would landscape and terrace parts of the property and leave others in their natural state are all well and good, but they bear not at all on the critical issue whether a variance was necessary to bring the original real party in interest into substantial parity with other parties holding property interests in the zone. (See *Hamilton* v. *Board of Supervisors, supra,* at p. 66 [269 Cal.App.2d 64 (75 Cal.Rptr. 106)].) [Fn. omitted.]"

The holding in *Topanga* was, thus, that in the total absence of findings in any form on the issues supporting the existence of conditions justifying a variance, the granting of such variance could not be sustained. In addition to so holding, the court spoke at length on the form which findings should take. In this respect, it said (*id.,* at pp. 516-517):

"Among other functions, a findings requirement serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis

and minimize the likelihood that the agency will randomly leap from evidence to conclusions. (See 2 Cooper, State Administrative Law (1965) pp. 467-468; Feller, *Prospectus for the Further Study of Federal Administrative Law* (1938) 47 Yale L.J. 647, 666. Cf. Comment, *Judicial Control Over Zoning Boards of Appeal: Suggestions for Reform* (1965) 12 U.C.L.A. L.Rev. 937, 952.) In addition, findings enable the reviewing court to trace and examine the agency's mode of analysis. (See *California Motor Transport Co.* v. *Public Utilities Com.* (1963) 59 Cal.2d 270, 274 [28 Cal.Rptr. 868, 379 P.2d 324]; *Swars* v. *Council of City of Vallejo* (1949) 33 Cal.2d 867, 871 [206 P.2d 355].) [Fn. 14 omitted.]

"Absent such roadsigns, a reviewing court would be forced into unguided and resource-consuming explorations; it would have to grope through the record to determine whether some combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate order or decision of the agency. Moreover, properly constituted findings[16] enable the parties to the agency proceeding to determine whether and on what basis they should seek review. (See *In re Sturm* (1974) *ante,* pp. 258, 267 [113 Cal.Rptr. 361, 521 P.2d 97]; *Swars* v. *Council of City of Vallejo, supra,* at p. 871.) They also serve a public relations function by helping to persuade the parties that administrative decision-making is careful, reasoned, and equitable. [Fn. 15 omitted.]

"By setting forth a reasonable requirement for findings and clarifying the standard of judicial review, we believe we promote the achievement of the intended scheme of land use control. Vigorous and meaningful judicial review facilitates, among other factors, the intended division of decision-making labor. Whereas the adoption of zoning regulations is a legislative function (Gov. Code, § 65850), the granting of variances is a quasi-judicial, administrative one. (See *Johnston* v. *Board of Supervisors* (1947) 31 Cal.2d 66, 74 [187 P.2d 686]; *Kappadahl* v. *Alcan Pacific Co.* (1963) 222 Cal.App.2d 626, 634 [35 Cal.Rptr. 354].) If the judiciary were to review grants of variances superficially, administrative boards could subvert this intended decision-making structure. (See 1 Appendix to Sen.

---

"[16]Although a variance board's findings 'need not be stated with the formality required in judicial proceedings' (*Swars* v. *Council of City of Vallejo, supra,* at p. 872), they nevertheless must expose the board's mode of analysis to an extent sufficient to serve the purposes stated herein. We do not approve of the language in *Kappadahl* v. *Alcan Pacific Co.* (1963) 222 Cal.App.2d 626, 639 [35 Cal.Rptr. 354], and *Ames* v. *City of Pasadena* (1959) 167 Cal.App.2d 510, 516 [334 P.2d 653], which endorses the practice of setting forth findings solely in the language of the applicable legislation."

J. (1970 Reg. Sess.) Final Rep. of the Joint Committee on Open Space Land (1970) pp. 102-103.) They could '[amend] . . . the zoning code in the guise of a variance' (*Cow Hollow Improvement Club* v. *Board of Permit Appeals, supra,* at p. 181 [245 Cal.App.2d 160 (53 Cal.Rptr. 610)]), and render meaningless, applicable state and local legislation prescribing variance requirements."

■■■ Despite the essential distinction between variances and conditional use permits,[3] we conclude that the function of the planning commission in the granting of conditional use permits "is a quasi-judicial, administrative one," subject to the same requirement as to findings which the court found applicable to the granting of a variance in *Topanga.* ■■■ We do not, however, find anything in footnote 16 (*ante* at p. 390 of this opn.) criticizing "the practice of setting forth findings solely in the language of the applicable legislation," which requires invalidating findings in the language of the applicable ordinance in all cases. The statutory language involved in *Topanga* (from Gov. Code, § 65906) stated only the general conclusion required to support the ultimate decision. It was, moreover, apparent that a finding in the terms of that statute would give no inkling whatever as to what the "special circumstances" relied upon were, or how strict application of the zoning ordinance would deprive the subject property of privileges enjoyed by other property in the zone. The requirement that the administrative decision disclose the "legally relevant sub-conclusions supportive of its ultimate decision" (11 Cal.3d at p. 516) can be fully met by findings in the language of the ordinance when the ordinance requires that the relevant sub-conclusions be specifically stated. The Los Angeles County Zoning Ordinance does just that. It requires the zoning board to reach seven specific subconclusions and, moreover, it describes these as the "findings" which must be made. It would be a reduction to absurdity of the principle stated in *Topanga* to apply it to findings made in the language of an ordinance which thus requires full articulation of the factors upon which the decision is based. The result would be that if the ordinance specified the findings to be made in respect to every evidentiary detail, it would be impossible to make valid findings thereunder.

[3]As stated in 56 Cal.Jur.2d, Zoning, section 188, page 70: "A variance, within the meaning of zoning and planning laws and ordinances, is a type of exception from the terms or application of such enactments, authorizing the owner to use his property in a manner different from the use or uses prescribed for the district or zone in which the property is located," whereas "[a] conditional use is an exceptional use that may be permitted on application and hearing as a compatible use within the terms of the ordinance, . . ." (*id.,* at § 160, p. 30).

Inasmuch as we find no defect in the findings, we find it unnecessary to discuss the respective parties' contentions with respect to the effect of Government Code section 65801.

### *Petitioners Were Not Denied a Fair Hearing*

■ The basis of petitioners' claim that they were denied a fair hearing is the assertion that the petition signed by 18 residents which was filed at the time of the hearing before the zoning board "was evidently not properly considered by the Board in their decision." They base this claim upon the board's finding No. 1 to the effect that "[t]here was one protest to the granting of this permit." The summary of the hearing recites that "Eight (8) persons were sworn, four of whom testified in favor, one in opposition, and one person as an interested observer." The transcript of the hearing clearly states that the board accepted the petition "for the file," and in answer to the chairman's question, Mr. Landee testified that the signers were opposed to the project. Moreover, the handwritten hearing summary stated that the opposition included a "Petition 18 names." This handwritten summary was also a part of the file which went to the planning commission. The reference in finding No. 1 to "one protest" does not require the assumption that such protest was not made in behalf of all 18 petitioning residents. The trial court was entitled to find that the petition was duly considered and, in the absence of a request for findings, we must imply that such finding was made.

### *Having Failed to Raise Such Claim in the Trial Court, Petitioners May Not Assert Lack of an Environmental Impact Report*

■ In lieu of an environmental impact report, the zoning board accepted an exemption declaration from its staff. This declaration was made on the basis of completion of an environmental assessment checklist indicating no substantial environmental impact. Such a declaration, made pursuant to Public Resources Code section 21080 and filed with the county clerk pursuant to section 21152, was sufficient to dispense with the requirement of an environmental impact report unless shown to have been improperly approved by the planning commission.

Petitioners made no attempt in the trial court to show any impropriety in the adoption of the negative declaration. The amended petition made no reference whatever to the exemption declaration nor to the absence of

an environmental impact report. During the course of the argument in the superior court, the deputy county counsel pointed out that the exemption declaration had not been challenged, saying in this respect: "That statement was never challenged, and it is not challenged in this lawsuit." Counsel for petitioners made no rejoinder to this assertion. It clearly appears that the absence of an environmental impact report was never placed in issue in the trial court.

The general rule is that "issues not raised in the trial court cannot be raised for the first time on appeal." (*Estate of Westerman,* 68 Cal.2d 267, 279 [66 Cal.Rptr. 29, 437 P.2d 517].) Petitioners have made no effort to show that any of the exceptions to this rule are here applicable; we, therefore, conclude that the issue is not properly before this court.

The judgment is affirmed.

Ford, P. J., and Allport, J., concurred.

A petition for a rehearing was denied May 24, 1977. On May 11, 1977, the opinion was modified to read as printed above.