[Civ. No. 62615. Second Dist., Div. Five. May 12, 1982.]

MARJORIE MARKLEY, Plaintiff and Appellant, v.
CITY COUNCIL OF THE CITY OF LOS ANGELES et al.,
Defendants and Respondents;
URBAN PACIFIC DEVELOPMENT CORPORATION et al., Real
Parties in Interest and Respondents.

COUNSEL

Hirsch & Ostrow and Perry L. Hirsch for Plaintiff and Appellant.

Ira Reiner, City Attorney, Gary R. Netzer, Assistant City Attorney, and Julie Downey, Deputy City Attorney, for Defendants and Respondents.

Manatt, Phelps, Rothenberg & Tunney, Ronald J. Silverman and Jane L. Ellison for Real Parties in Interest and Respondents.

OPINION

LAVINE, J.*—This is an appeal from a judgment denying a peremptory writ of mandate. By judgment the court determined that "there was adequate notice, substantial evidence and requisite findings to support the administrative agency actions below." In so doing, the court upheld the city council's approval of tentative tract No. 37481 for construction of 115 condominium units and 6 maids' quarters in the Westwood-Wilshire area of the City of Los Angeles.

*Assigned by the Chairperson of the Judicial Council.

FACTS

The proposed project is a new 20-story condominium complex with subterranean parking in an area along Wilshire Boulevard presently developed with high-density multifamily structures, 16-to-22 stories in height. Appellant lives in an existing condominium structure adjacent to the proposed project which is, itself, 13 stories in height.

The "real party" or "the developer" caused a draft environmental impact report (EIR) to be prepared in July 1979. A final environmental impact report was prepared and circulated in October 1979. In January 1980 supplemental environmental data was circulated in response to environmental concerns expressed by residents of appellant's building, the Churchill, located adjacent to the proposed project. Among other things residents of the Churchill wanted a higher structure to be constructed but with a smaller "footprint" (that is a building with a smaller horizontal cross-section) built farther away from the Churchill, whereas members of the other residential groups supported the developer's plan in opposition to that suggested by the Churchill group.

By decision of December 6, 1979, the deputy advisory agency of the City of Los Angeles approved the tentative tract, subject to some six pages of conditions for its development, based on four pages of findings made pursuant to the Subdivision Map Act, Government Code section 66474.60 et seq. and the California Environmental Quality Act of 1970 (CEQA). This decision was made following a public hearing held on November 7, 1979. Notice of such had been sent on October 19, 1979, to all interested persons in the surrounding area including appellant. Appellant appealed from such decision.

By action of January 17, 1980, the city planning commission denied appellant's appeal of the tentative tract approval after hearing public testimony in support and in opposition to the project, and considering the staff report recommending denial of the appeal. Again appellant appealed to the Los Angeles City Council, both to the planning and environment committee of the city council and the city council itself.

On February 28, 1980, the Los Angeles City Council adopted the report of its planning and environment committee recommending denial, and adopted the findings of the advisory agency. Also the council adopted a statement of overriding considerations pursuant to CEQA, and certified that the EIR had been reviewed and found to be in com-

pliance with CEQA and state and local guidelines for the implementation of CEQA.

Appellant sought judicial review of the actions of the City of Los Angeles by petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5.

## ISSUES PRESENTED

1. Whether petitioner was denied a fair hearing at the administrative level by respondents and real parties.

2. Whether the trial court erred in applying the "substantial evidence" standard rather than the "independent judgment" standard in its review of the administrative proceedings.

3. Whether the city complied with the Subdivision Map Act requirements in approving this project.

4. Whether the city complied with the CEQA of 1970 in approving this project.

5. Whether the administrative findings are supported by the evidence.

## DISCUSSION

1. ■ Whether petitioner was denied a fair hearing at the administrative level by respondents and real parties.

Petitioner did receive notice of the public hearing of November 7, 1979, before the deputy advisory agency, and petitioner's husband attended that hearing. Petitioner contends that she and her husband were misled by the real party in interest so that their opportunity to prepare for and present evidence and arguments on November 7, 1979, were thwarted by actions of the real party.

Respondents contend that they are not responsible for actions of the real party and that the governmental agencies involved gave fair and full due process. We suppose that petitioner's contention might be analogous to the doctrine that if actions of a party mislead or prevent another party from participating in a trial, that such is "extrinsic fraud," and that upon appropriate motion the moving party's rights can

be protected. (See, 5 Witkin, Cal. Procedure (2d ed. 1971) §§ 183-185, pp. 3540-3543.) So, let us examine petitioner's contention. Petitioner's husband was contacted by Michael Reyes, president of the developer in June 1979. They met, and Mr. Reyes displayed a preliminary site plan which petitioner's husband criticized because of the closeness of the proposed structure to the Churchill. Petitioner's husband proposed a substitute plan, namely that a higher building with a smaller "footprint" be constructed farther away from the Churchill[1] (this is the proposal which is opposed by two other homeowner groups). Mr. Reyes expressed interest and said he would get back to petitioner's husband about the proposal. Real parties did send to petitioner's husband a copy of a revised site plan.

Apparently the parties did not communicate with each other after that. Petitioner contends that when her husband went to the hearing on November 7, 1979, they did not know which of the two plans would be considered. Respondents contend that petitioner and her husband had at least constructive notice since the notice of the hearing had been sent 18 days (rather than the statutory 10 days) prior to the hearing. It invited comments on the environmental documentation and identified the location of the complete file available for public inspection. The draft EIR had been available for review since the previous July, and notice of that document provided to surrounding home owners' groups which had requested such notice.

In a judicial hearing pursuant to Code of Civil Procedure section 1094.5 ordinarily no evidence is admissible except that contained in the administrative record below. (*City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 771 [122 Cal.Rptr. 543, 537 P.2d 375]; Administrative Mandamus, (Cont.Ed.Bar 1966) § 13.5, pp. 218-219; *id.* (Cont.Ed.Bar Supp. 1981) p. 155.) Subdivision (e) of Civil Procedure section 1094.5 provides as follows: "(e) Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f) of this section remanding the case to be reconsidered in the light of such evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit such evidence at the hearing on the writ without remanding the case."

---

[1]Petitioner inconsistently urged to the city council at later times that the adverse impacts "... may be reasonably mitigated by ... reduction in height and number of units of the proposed structure."

Petitioner complains that she was denied proper notice as a result of real parties' actions, but any evidence supporting same was not raised before the administrative bodies. Therefore, this contention and the evidence proffered in support thereof at the trial were not properly before the trial court, and hence this contention is not reviewable on appeal unless it falls within the statutory exceptions.

There is no basis in the evidence for concluding that this contention could not have been brought up before any of the several administrative tribunals. Petitioner was aware of her position in this regard prior to the initial hearing before the advisory agency. If petitioner had raised this issue at that time, or in any of the intermediate stages, and if her contention had any merit, the administrative bodies could have acted thereon by granting petitioner additional time to study her position and to produce any additional evidence. Petitioner failed to do any of these things which were in her power to do at an earlier stage, and cannot be heard to assert this contention as an afterthought.

At the hearing of November 7 before the advisory agency, petitioner was not present but was represented by her husband. He offered no comment during this hearing, but three residents of the Churchill (petitioner's condominium complex) expressed their concern and requested a delay to enable them to ascertain a collective Churchill position. The deputy advisory agency denied the continuance since adequate notice had been given, and the project documents had been available for public inspection.

Let us assume, arguendo, that there was some defect in the notice given by respondents or that the real parties had misled petitioner into believing that her substitute proposal (the Churchill plan) would be considered at the November 7 hearing. Petitioner had an opportunity at the November 7 hearing to argue against the site plan actually presented, but neither she nor her husband spoke or presented anything at such hearing.

This was not the end of the road for petitioner. Unlike a court trial, where normally the parties have the chance to present evidence only at the trial itself, in the administrative process involved here petitioner had four opportunities to present objections, evidence and argument. Three of these opportunities occurred after November 7, 1979. Both the city planning commission and the city council could inquire into any phase of the matter under appeal. Los Angeles Municipal Code section 17.06

allows both the city planning commission and the city council to hear the testimony of the subdivider or his representative, the appellant, the advisory agency, and any documents or testimony from "any competent person respecting the character of the neighborhood in which the subdivision is to be located, the kinds, nature and extent of improvements, quality and kinds of development to which the area is best adapted, or any other phase of the matter into which it may desire to inquire."

Thus petitioner had the opportunity of a hearing de novo on two or three later occasions. *Briggs v. State of California* ex rel. *Dept. Parks & Recreation* (1979) 98 Cal.App.3d 190 [159 Cal.Rptr. 390] controls on this point. In that case the regional coastal commission had denied an application for a development permit—an appeal was taken to the state commission which denied the appeal and refused the permit. The trial court, based on actions of the regional commission, found in favor of appellant but the Court of Appeal reversed stating at page 195, footnote 2: "The [trial] court's findings placed undue emphasis on the procedures and decision of the Regional Commission. The proceedings before the State Commission, however, are de novo and completely nullify the former determinations of the Regional Commission. [Citation.]"

Petitioner is entitled to a hearing at some meaningful point in the approval process. (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 616 [156 Cal.Rptr. 718, 596 P.2d 1134].) Petitioner was afforded a hearing with opportunity for presentation of all of her arguments against the site as actually proposed at the three later hearings. The petition admits that petitioner was actually heard twice, once before the city planning commission and once before the city council.

Petitioner argues that she had no meaningful opportunity at the later hearings because both the planning commission and city council followed staff recommendations and adopted the deputy advisory agency's findings as their own. Carrying petitioner's contention to its logical conclusion, any reviewing agency would then have to make some change in the findings and recommendations of the agency being reviewed in order to "prove" that the reviewer was exercising independent consideration. We know of no such requirement in administrative law.

2. ▮ Whether the trial court erred in applying the "substantial evidence" standard rather than the "independent judgment" standard in its review of the administrative proceedings.

Petitioner contends that judicial review by the trial court of her neighbor's subdivision project requires the exercise of the court's independent judgment and a reweighing of the evidence because her rights in her property are fundamental and vested.

The statute governing the quantum of judicial review clearly limits judicial review to the "substantial evidence" test. Public Resources Code section 21168 states: "Any action or proceeding to attack, review, set aside, void or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of non-compliance with the provisions of this division [Division 13. Environmental Quality] shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure.

"In any such action, *the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence* in the light of the whole record." (Italics added.)

Appellant urges that because Public Resources Code section 21168.7 states that "[s]ections 21168 and 21168.5 are declaratory of existing law [all of these sections were enacted in 1972] with respect to the judicial review of determinations or decisions of public agencies made pursuant to this division," that the trial court is governed by the "fundamental vested rights" tests of *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 530 P.2d 29], and *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144 [93 Cal.Rptr. 234, 481 P.2d 242].

We do not agree with appellant on this question. A surrounding property owner has no fundamental vested right in his neighbor receiving or being denied a zoning variance, (*Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 730 [135 Cal.Rptr. 588]) or in his neighbors receiving a special use permit. (*Jones* v. *City Council* (1971) 17 Cal.App.3d 724, 728-729 [94 Cal.Rptr. 897].)

In *Friends of Lake Arrowhead* v. *Board of Supervisors* (1974) 38 Cal.App.3d 497 [113 Cal.Rptr. 539] the court said at page 518 footnote 18: "On the record before us it does not appear that the decision of the planning commission approving the tentative tract map affected

'fundamental vested rights' of any of the plaintiffs." In *Friends of Lake Arrowhead* the neighboring owners had challenged approval of a tentative tract map for 55 multiple residental units.

In *Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal. App.3d 712 [117 Cal.Rtpr. 96], an incorporated group of community residents challenged, on environmental grounds, the city's approval of a shopping center, a parking lot and the widening of Baldwin Avenue. The appellate court affirmed the action of the trial court in applying the "substantial evidence" test, and held at page 725: "It is argued that under the decision in *Strumsky* . . . the court constitutionally was required to independently review the evidence. Such argument is misplaced. The requirement applies only where a fundamental vested right is involved and on this record we cannot hold that petitioners' interest in the width of Baldwin Avenue was such a right. . . ."

In *Mountain Defense League* v. *Board of Supervisors, supra*, 65 Cal.App.3d 723, an unincorporated association sought to block approval of a development plan for their neighbor, Martin. The appellate court upheld the "substantial evidence" standard at page 730: "Here Lindsley and the members of the Defense League make no allegations which connect them with the specific piece of land in question. They say they enjoy the open space by hiking through it, camping in it and looking at it. But, they have acquired no rights to do this on the Martins' property. Just as there is no vested right to obtaining a professional license, in contrast to having one revoked . . . so petitioners here have no vested right in having the Martins develop their land according to the petitioners' design. The trial court's use of the substantial evidence test in reviewing the Board's decision was proper."

In *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274 [152 Cal.Rptr. 585], residents sought to set aside approval of construction of an athletic stadium at California State University at Fresno based on environmental considerations. The court rejected plaintiffs' contention that their fundamental rights were affected, and stated at page 280: "Plaintiffs' contention that a fundamental right is involved where an administrative agency authorizes a public construction project after determining that an EIR is sufficient, appears to be predicated on a conclusive assertion as it is not supported by any judicial precedents.

"Despite the legislatively expressed public policy considerations inherent in matters of environmental concern (Pub. Resources Code, §§ 21000, 21001), California courts have consistently held that no fundamental right is involved in *granting, as opposed to cancellation*, of a construction permit." (Italics in original.)

This court's appellate review is also governed by the substantial evidence test, since that rule governed the trial court. (*Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 405 [151 Cal.Rptr. 866]; *Mountain Defense League* v. *Board of Supervisors, supra*, 65 Cal.App. 3d 723, 728.)

The case at bar is a good illustration of the wisdom of the doctrine of separation of powers that entrusts to administrative bodies rather than to the courts determinations concerning what kind of building should be erected, where there are competing interests, including property owner groups, on each side of the controversy. Administrative bodies are permitted to make all of these determinations provided that (1) substantial evidence supports the administrative decision; and (2) an opportunity for a fair hearing is afforded to interested parties.

Appellant contends that the fact that the Los Angeles City Council placed a moratorium on the construction of new high rise condominia in the Westwood-Wilshire area several months later lends support to their contentions. On the contrary, we consider that this merely demonstrates that it is the legislative branch which knows, better than the judicial branch can know, when, where and how new construction should be permitted or halted, provided that the law is duly followed.

3. ■ Whether the city complied with the Subdivision Map Act requirements in approving this project.

Appellant urges that the city violated Government Code sections 66474.61, subdivisions (a) and (b) in finding that the project was consistent with applicable general and specific plans. But the specific plan for this area, namely the "Westwood Community Plan," designates the area in which the subject property is located as very high residential density area, allowing 80 plus dwelling units per gross acre. The subject property contains 1.43 gross acres, and the project as proposed is approximately half of the allowable density of the existing zone or community plan designation. Accordingly the advisory agency found, and the commission and city council agreed, that the proposed map to-

gether with the design and improvement were consistent with the applicable general and specific plans.

The advisory agency properly found consistency between the project and the most specific applicable planning for the area. Those parts of the general and least site-relevant policies, as enunciated in the city-wide plan, were not and should not be applied. It is a familiar rule of legal and legislative construction that the specific applies and controls the general. (Civ. Code, § 3534; *Hart* v. *City of Beverly Hills* (1938) 11 Cal.2d 343, 347 [79 P.2d 1080].)

Government Code section 66474.61 provides in part: "In cities having a population of more than 2,800,000, the advisory agency, appeal board or legislative body shall deny approval of a final or tentative map if it makes any of the following findings:

"(a) That the proposed map is not consistent with applicable general and specific plans.

"(b) That the design or improvement of the proposed subdivision is not consistent with applicable general and specific plans.

"(c) That the site is not physically suitable for the type of development.

"(d) That the site is not physically suitable for the proposed density of development.

"(e) That the design of the subdivision or the proposed improvements are likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat.

"(f) That the design of the subdivision or the type of improvements is likely to cause serious public health problems...."

The advisory agency, appeal board and city council, and each of them, did *not* make any of the findings which would have compelled them to deny approval of a tentative map under the above statute. The city did find in accordance with section 66474.61, subdivisions (a) and (b):

(a) That the type and density of the project was physically suitable for the site. This is supported by evidence before the city council that

there are condominiums of similar size located in the immediate surrounding area.

(b) The site was physically suitable in that conditions had been imposed requiring two parking spaces per dwelling unit, and an additional half parking space per unit for guests.

(c) Vehicular access from Wilshire Boulevard was restricted.

(d) A parking area, driveway plan, and improvements of Wilshire Boulevard and Holmby Avenue adjoining the tract, were required.

Appellants contend that the "Westwood Community Plan" with respect to traffic is no longer applicable since the plan was premised on the eventual construction of the Beverly Hills Freeway, which was abandoned subsequent to such plan. The logic of appellant's argument would be that immediately after the abandonment of the Beverly Hills Freeway the city could no longer permit any new construction in the Westwood (or other affected areas) if any such construction would cause any increase in the traffic along Wilshire Boulevard. There are at least two answers to that assertion: (a) the city council and its agencies did impose affirmative obligations upon the developer to reduce, as much as feasible, any increased traffic impact upon Wilshire Boulevard; and (b) the city council retained its power to determine, and did determine several months after the tentative tract map was approved, that the time had then come for a temporary cessation of further development along the Wilshire-Westwood Scenic Corridor, partly because of increase in traffic.

4. ■ Whether the city complied with the CEQA in approving this project.

Public Resources Code section 21081 provides: "Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been completed which identifies one or more significant effects thereof unless such public agency makes one, or more, of the following findings:

"(a) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report.

"(b) Such changes or alterations are within the responsibility and jurisdiction of another public agency and such changes have been adopted by such other agency, or can and should be adopted by such other agency.

"(c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report."

This code section requires findings regarding only *significant* environmental effects identified in the EIR. None of the impacts cited by appellant are so identified in the EIR.

Public Resources Code section 21068 states that: "'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." This definition means the effect on the environment of persons in general and not particular persons such as appellant.

*Topanga Beach Renters Assn.* v. *Department of General Services* (1976) 58 Cal.App.3d 188, 195 [129 Cal.Rptr. 739] holds: "The issue is not whether demolition of structures will adversely affect particular persons but whether demolition of structures will adversely affect the environment of persons in general."

However, in accordance with the spirit, if not required by the letter, of the act (Pub. Resources Code § 21000 et seq.), and California Administrative Code, title 14, section 15000 et seq., the city did make extensive findings explaining its action. The findings identify the potential adverse impacts which are considered in the EIR, and the feasible mitigation measures, namely: (a) traffic circulation; (b) air quality; (c) solid waste disposal; and (d) library services. In accordance with California Administrative Code, title 14, section 15088, subdivision (a)(3), environmentally superior but economically infeasible alternatives and mitigation measures are identified.

Although the EIR identifies most of the impacts as being slight or short-term and none as significant, the findings track the spirit of Public Resources Code section 21081 and the terms of California Administrative Code, title 14, section 15089 by demonstrating the process of the decision-maker in balancing "the benefits of a proposed project against its unavoidable environmental risks in determining

whether to approve the project." The findings identify (a) conformity to the community plan, (b) new housing and (c) new construction jobs as beneficial impacts of the project.

Even if there were significant environmental effects (the administrative agencies found none) the project still may be approved. This power, given to the administrative bodies by statute, is explained in *Laurel Hills Homeowners Assn.* v. *City Council* (1978) 83 Cal.App.3d 515, at page 521 [147 Cal.Rptr. 842]: "[I]f economic or social conditions make infeasible the mitigation of one or more significant adverse environmental effects of a project, such project may nevertheless be approved provided the project is otherwise permissible under applicable laws and regulations. [Citation.]

". . . In other words, CEQA does not mandate choice of the environmentally best feasible project if through the imposition of feasible mitigation measures alone the appropriate public agency has reduced environmental damage from a project to an acceptable level."

An example of this process may be applied to one of the principal complaints of petitioner, namely the wind-jetting effect. Wind-jetting occurs when two tall buildings are located in close proximity to one another, thus increasing wind velocity. Possible wind-jetting effects are identified in the final EIR with recommended architectural mitigation measures. Such measures were incorporated into the project by turning the proposed structure approximately 45° to avoid having two large, flat surfaces adjacent to one another. Thus, the potential for an adverse impact has been considered, and ameliorative measures incorporated into the decision-making process.

As required by *Topanga Assn. for a Scenic Community* v. *County of Los Angeles*, (1974) 11 Cal.3d 506, at page 515 [113 Cal.Rptr. 836, 522 P.2d 12]: the findings demonstrate "the analytic route the administrative agency traveled from evidence to action." Respondents' careful adherence to CEQA is shown by the lengthy and thorough draft EIR, followed by a final EIR, with supplemental EIR data.

These documents discussed the impact of the proposed project, determined the adverse environmental impacts to be insignificant or merely cumulative and, even if cumulative, imposed feasible mitigation. Thus (a) an irregular building surface was selected in order to mitigate any wind-jetting effect; (b) a diagonal orientation of the proposed structure

was adopted to alleviate the cumulative interruption of view caused, or to be caused, by this and other Wilshire Boulevard high-rise projects; (c) heliport noise was not treated because no environmental impacts arose as a result of this project; (d) cumulative impact of the project upon police services was mitigated by a requirement that the developer consult with the police department's crime prevention unit; and (e) no mitigation measures were proposed for the cumulative contribution to the loss of moderately priced housing in the area because of the offsetting high demand for quality condominiums contemplated by this project (and provision for increase in new housing units).

The oral proceedings before the deputy advisory agency on November 7 shows the attention to the environmental impacts noted in the final EIR. The advisory agency decision discussed the mitigation of four adverse environmental impacts, namely: (1) traffic circulation; (2) air quality; (3) solid waste; and (4) libraries. Project alternatives were discussed. Although two unmitigated adverse environmental impacts concerning traffic circulation and air quality were recognized, a statement of overriding considerations was adopted noting the beneficial impacts of the new housing and temporary construction employment opportunities that the project would provide.

In essence, the respondents found that the adverse impacts, whether significant or not, were sufficiently mitigated; that further mitigation or alternatives were unfeasible; that the project conformed to the community plan; that the project was physically suitable to the site; and that the project would create new housing and temporary construction jobs within the city.

The administrative agencies did all they should, and the trial court fulfilled its judicial role. In *McMillan v. American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175 [131 Cal.Rptr. 462], the court reviewed a challenge to a tentative tract map approval by the Richmond City Council regarding a 70-unit condominium. The Contra Costa Superior Court had set aside the approval of the tentative tract map. The appellate court, upon reviewing the findings of the Richmond City Council, reversed the trial court and said at pages 181-183: "The function of an appellate court in cases like this is to determine whether (1) the findings of the agency or local governmental body (hereafter 'agency') are legally sufficient, and (2) whether the findings are supported by substantial evidence and support the agency's decision [citation]. In

making these determinations this court must resolve any reasonable doubts in favor of the agency findings and decision [citations] . . . .

"*Topanga* [*Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506] reiterates the long established rule in California that administrative findings need not be as precise or formal as would be required of a court [citation]. . . ."

Since *McMillan* v. *American Gen. Fin. Corp., supra,* 60 Cal.App.3d 175, findings of fact are no longer required, even in the courts. The only requirement is a statement of decision as to each of the principal controverted issues at trial. (Code Civ. Proc., § 632 (as amended in 1981).)

5. ■ Whether the administrative findings are supported by the evidence.

Petitioner fails to set forth all evidence which might have a bearing on the administrative decisions. In *Jacobson* v. *County of Los Angeles* (1977) 69 Cal.App.3d 374 [137 Cal.Rptr. 909], the court considered petitioners' claim that there was not substantial evidence to support the required findings for the granting of a conditional use permit authorizing construction, operation and maintenance of a tennis club. Petitioners did not make a fair statement of the evidence in their brief. In considering this omission, the court, quoting from *Brown* v. *World Church* (1969) 272 Cal.App.2d 684, 690-691, stated at page 388 [77 Cal.Rptr. 669, 45 A.L.R.3d 622]: ""In this connection, we repeat what every lawyer should know, namely, that when an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.

""" . . . Their failure to do so will be deemed tantamount to a concession that the evidence supports the findings. . . [Citation]."""

Despite appellant's omission we have examined the evidence and find that it is more than sufficient to constitute substantial evidence supporting the findings.

(a) Project consistency with applicable city plans.

The property is zoned R5-3 and designated for very high residential density. Street improvements to be installed as a condition of project approval enhanced the development's general consistency with the intent and purpose of the applicable city plans. Moreover, the prior use of the project site was inconsistent with the zoning and general plan.

(b) Physical suitability of the project site.

The project acreage is compatible with the surrounding environmental setting. It is complementary to the existing buildings where many residential high-rise and commercial projects were then undergoing development.

(c) Adverse environmental impacts.

The findings of adequate and reasonable mitigation of the adverse environmental impacts consisting of (1) traffic circulation; (2) air quality; (3) solid waste; and (4) libraries were supported by the evidence.

Appellant requests an alternative form of relief rather than the granting of a peremptory writ (which would presumably require the tearing down of real party's building) namely, that this court remand the case to the trial court for the purpose of converting the action into one for damages.

Code of Civil Procedure section 1094.5 confers no power on this court to convert an action for administrative mandamus review into a plenary action for damages. Subdivision (e) provides in part: "Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f) of this section remanding the case to be reconsidered in the light of such evidence; . . ." Neither of the situations embraced in subdivision (e) exist in this case.

Even if we were to remand this case the trial court would likewise lack power to convert an action for administrative mandamus review into a plenary action for damages. If petitioner claims a cause of action against the real party and/or the respondents, her remedy may be to commence a new action. Certainly the effect of an affirmance of the judgment below and denial of a writ does not create any res judicata effect or estoppel by judgment on the right of petitioner to file a new and

plenary action for damages. (*Consumers Lobby Against Monopolies* v. *Public Utilities Com.* (1979) 25 Cal.3d 891, 901-902 [160 Cal.Rptr. 124, 603 P.2d 41]; *Richer* v. *Superior Court* (1976) 63 Cal.App.3d 748, 755-756 [134 Cal.Rptr. 52]; *McDonough* v. *Garrison* (1945) 68 Cal. App.2d 318, 327 [156 P.2d 983].)

The judgment is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.