[No. B020791. Second Dist., Div. Five. Dec. 24, 1987.]

NO SLO TRANSIT, INC., et al., Plaintiffs and Appellants, v. CITY OF LONG BEACH et al., Defendants and Respondents.

**COUNSEL**

C. Robert Ferguson for Plaintiffs and Appellants.

Kadison, Pfaelzer, Woodard, Quinn & Rossi, McDermott, Will & Emery, Lee L. Blackman, John C. Funk, John R. Calhoun, City Attorney, and Heather A. Mahood, Deputy City Attorney, for Defendants and Respondents.

OPINION

NEBRON, J.*—Petitioners appeal from a judgment of the superior court finding that the Los Angeles County Transportation Commission (LACTC) did not abuse its discretion in certifying as adequate an environmental impact report (EIR) for the Los Angeles to Long Beach Rail Transit Project (the Project). LACTC would route the Project along Long Beach Boulevard in the City of Long Beach.

Petitioners are businessmen owning interests along Long Beach Boulevard. They assert that the chosen routing will adversely affect their businesses. Petitioners acknowledge that the EIR examined an exhaustive variety of environmental issues, but they challenge the documentation, the study process, the decision of LACTC, and the trial court's ruling.

*Facts*

We set forth the facts in considerable detail in order to make disposition of the numerous issues raised by petitioners easier to understand.

In November 1980 the voters of Los Angeles County approved Proposition A, which authorized a one-half cent sales tax to fund construction and operation of rail transit systems to serve various transportation corridors in Los Angeles County. In 1982, LACTC formally designated the Project as the first of the 13 transit corridor systems to be undertaken in accordance with Proposition A.

In January 1983, the Long Beach Planning and Building Department prepared a report regarding various alternative alignments of the Project within the city. Several public hearings were held to discuss the alternative alignments. Later, the Long Beach City Council recommended further study of four alignments.

Preparation of the draft environmental impact report (DEIR) commenced in August 1983, with "scoping meetings" with governmental entities identified as "Responsible Agencies" under the California Environmental Quality Act (CEQA)[1] as well as with many other interested agencies, organizations and individuals. In all, more than 100 individuals and organizations were consulted during development of the DEIR.

The DEIR was released by LACTC in 1984 and widely circulated. That document considered four alternative alignments of the Project in Long

---

*Assigned by the Chairperson of the Judicial Council.
[1] Public Resources Code section 21069.

Beach.[2] It described each of the proposed alignments, the existing conditions along the alternative routes, and the environmental impacts of the Project for all alternatives. Also considered was a "No Project" alternative and a bus alternative.

Thereafter, the views of the public, organizations, companies, and governmental agencies with respect to the proposed plan were solicited at six public hearings. A number of individuals expressed the opinion that other alignments for the Long Beach segment would be superior to the four alternatives under consideration. A broad base of public support existed for a routing along Long Beach Boulevard.

There was also considerable public interest in alternatives which had not been selected for comprehensive environmental analysis. LACTC, therefore, ordered preparation of a conceptual assessment report (CAR) to identify additional Project routes for further consideration. Hearing regarding the alternatives set forth in the CAR was held in July 1984. After reviewing the CAR and hearing public testimony, the Long Beach City Council requested an examination of three additional routes. One was a modification of one of the routes already studied. This route was generally referred to as the "Modified River Route" and was supported by petitioners. Another route was the "Long Beach Boulevard Two-way Alternative" which ultimately was supported by the City of Long Beach and thereafter adopted by LACTC as the alignment of the Project in Long Beach.

In response to Long Beach's request, LACTC authorized preparation of a supplemental environmental impact report (SEIR) to describe and assess the environmental impacts of the additional alternatives for the City of Long Beach. The SEIR, issued in December 1984, placed special focus upon the possible traffic impacts of each of the new Long Beach alternatives.

Both public review and public hearing followed release of the SEIR. At a public hearing held January 9, 1985, Mr. Robert Paternoster, director of the Long Beach Planning and Building Department, made lengthy comments and submitted a written discussion expressing various concerns as to the proposed alternatives. Also submitted were extensive written and oral comments from citizens and groups favoring the Long Beach Boulevard route. Thereafter, LACTC's staff met with Long Beach officials to discuss ways of resolving the city's concerns.

At a meeting held on January 25, a design for the Long Beach Boulevard route which would provide additional mitigation of environmental impacts

---

[2] Also considered were three alternative alignments for each of the other portions of the entire Project—i.e., the downtown Los Angeles and midcorridor segments.

was proposed. A collection of specific transportation system management proposals concerning signal phasing and restrictions on left turns, U-turns, and mid-block openings was discussed. "Construction impact" was found to be significant. The SEIR and final environmental impact report (FEIR) indicated that construction time would require from 20 to 30 months.

Following the January 25 meeting, LACTC's staff and consultants conducted studies of the potential impacts of the proposed mitigation measures to determine if the measures might cause adverse consequences requiring a further or more detailed review. It was determined that these measures to improve the Project would not, if ultimately implemented, have adverse impact on other traffic concerns.

LACTC consultants completed the FEIR in March 1985. The report included a listing of Project impacts and proposed mitigation measures, as well as responses to the comments of agencies and the public on the DEIR and the SEIR. The report contained extensive discussion of each of the traffic issues, including the impacts of the refinements proposed to mitigate impacts of the Project on Long Beach Boulevard traffic.

In that same month, LACTC issued a report entitled "Alternatives Evaluation," in which all seven of the previously described alternatives for the routing of the Project in Long Beach were comparatively assessed. This document presented the implications and relative merits of the seven Long Beach alternatives evaluated in the DEIR, SEIR, and FEIR, with particular focus on the two alignments which had received the greatest attention during the environmental review process—the Modified River Route and the Long Beach Boulevard alternative. Unlike the FEIR, which was primarily concerned with a detailed assessment of the environmental impacts of each alternative, the Alternatives Evaluation reviewed many nonenvironmental policy factors, such as service, utilization, and cost.[3]

LACTC staff recommended approval of the FEIR and selection of the Long Beach Boulevard alternative on March 13, 1985. Staff specifically described the reasons why it regarded the Long Beach Boulevard alternative to be the preferable routing. LACTC then adopted a resolution which certified the FEIR as being in compliance with the requirements of CEQA. The certified FEIR was then sent to the Long Beach City Council. That

---

[3] Consideration of such factors is not required by CEQA (Pub. Resources Code, § 21081; CEQA Guidelines, Cal. Admin. Code, tit. 14, § 15091), but was provided to assist the decisionmakers in the policy judgment to be made. No findings were made as to these policy areas. Under CEQA, findings are required only for environmental issues.

body held a public meeting on March 19 for the purpose of selecting its preferred alignment for recommendation to LACTC.

In anticipation of the March 19 meeting, Mr. Paternoster prepared a report reviewing the factual information in the FEIR. He concluded that adoption of the design improvements recommended by the city at the January 9 public hearing and discussed in the FEIR rendered the Long Beach Boulevard alignment environmentally equivalent to the Modified River Route alignment. The alignment choice between the Modified River Route and the Long Beach Boulevard alternative was to be made on the basis of transportation policy rather than environmental considerations. Paternoster recommended the Modified River Route over the Long Beach Boulevard route.

Thereafter, the Long Beach City Council voted to recommend that LACTC adopt the Long Beach Boulevard alternative over the river route. This resolution was transmitted to LACTC; the Paternoster report was not.

On March 27, 1985, LACTC held a public hearing regarding final project approval. Based on the detailed record and the recommendations of LACTC's staff and the City Council of Long Beach, LACTC adopted the Long Beach Boulevard Alternative as the Long Beach segment of the rail transit Project. LACTC adopted extensive findings and a statement of overriding considerations as required by CEQA and the State of California's CEQA guidelines.

On March 29, 1985, LACTC filed Notice of Determination regarding approval of the rail transit Project.

On April 15, 1985, Daniel S. Caufield, program director for the Project, met with the members of the Long Beach Boulevard Area Association to discuss the design and development of the Project. In preparation for this meeting, Caulfield prepared a two-page agenda of topics to be considered. The agenda set forth time estimates for preliminary design of the Project as well as construction and commencement of rail transit service. There were indications that construction which would affect Long Beach Boulevard would encompass the period from September 1985 to September 1989, or 48 months.

### Issues

Petitioners present a prolix attack on the sufficiency of the documentation in this case, citing only those portions of the evidence favorable to their contentions rather than making a presentation of all evidence which might

have had a bearing on the trial court's decision. This court, therefore, has explored in detail the record before us in order to achieve a comprehensive review of the case. (Cf. *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].) A distillation of the many issues and subissues reveals the following to be the crux of the appeal: (1) That LACTC was deprived of pertinent environmental information by the failure of the Long Beach City Council to send it a staff memorandum which had recommended a different routing than that ultimately chosen by the Long Beach City Council and the LACTC; (2) that the Project has been changed in a way sufficient to require a new EIR; (3) that the EIR does not adequately study the "realistic" benefits of the Project, its economic impacts, and its effects on rush-hour traffic, and does not adopt "effective" mitigation measures to avoid its adverse effects; (4) that the LACTC failed to make required findings in support of the selected route; and (5) that reversal of the trial court is required because that court refused to permit discovery by way of deposition of several LACTC officials.

A few observations are in order before we discuss the issues raised in this appeal. ■ First, petitioners refer to review functions of this court as "de novo proceedings."[4] They are not.

■ ■ ■ ■ Second, some issues now raised by petitioners are improperly before us as not being raised in the trial court.[5]

[4] Petitioners assert that the initial and primary questions for this court to decide are whether to permit further discovery (see *infra,* at p. 260 for discussion of this issue) or whether to review respondents' procedures on a "de nova" (*sic*) basis and declare the administrative process inadequate.

Petitioners rely on *Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019 [213 Cal.Rptr. 712], to support their position that they are entitled to a de novo hearing before the appellate court. In that case, plaintiff sued for injunctive relief and damages based on defendants' fraud in inducing him to enter into to a secured loan transaction. The action remained essentially dormant for over two and one-half years and defendants successfully moved to dismiss under Code of Civil Procedure section 583, subdivision (a). The appellate court reversed, holding that, in the absence of a showing of some prejudice by defendants, the sanction of dismissal was improper. The court held that a trial court is in no better position than an appellate court to resolve issues presented by a Code of Civil Procedure section 583, subdivision (a) motion and that a decision to dismiss is reviewable as a question of law. The facts and reasoning of that case are totally inapplicable to this case.

[5] For example, petitioners contend that nowhere in the administrative record is there a discussion of the impact of the proposed Long Beach routes on the Project as a whole. We have read the transcript of the trial proceedings. Assuming that issues were raised off the record, or otherwise, they could have been preserved by making a specific objection to the proposed findings of the trier of fact. Further, no request for a finding on this issue was contained in appellants' request for statement of decision. Our review is limited to the sufficiency of the evidence to support the findings and the court is not required to search the record for errors. (*Markley* v. *City Council* (1982) 131 Cal.App.3d 656, 673 [182 Cal.Rptr. 659]; *Cleary* v. *County of Stanislaus* (1981) 118 Cal.App.3d 348, 360 [173 Cal.Rptr. 390].)

Third, petitioners suggest, without citation to the record, that this court undertake a broad search of the extensive administrative record to seek out alleged error. At the appellate stage of these proceedings, it is petitioners' burden[6] to demonstrate in what particular respect LACTC lacked substantial evidence to support its findings.[7] This court need examine the record only to the extent specific challenges to its sufficiency are raised. ■ "The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. [Citation.] It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings." (*McCosker* v. *McCosker* (1954) 122 Cal.App.2d 498, 500 [265 P.2d 21].)

*Was LACTC Deprived of Any Pertinent Environmental Information as a Result of Long Beach's Failure to Forward to LACTC the March 19, 1985, Report of the Long Beach Planning Department? No.*

■ Petitioners contend that because the staff recommendation and the opinion of the Long Beach Planning Department were not forwarded to LACTC their rights were substantially prejudiced.

---

Nevertheless, based on petitioners' own argument, it would appear at first blush that they would not have prevailed on this issue. (See *Big Rock Mesas Property Owners Assn.* v. *Board of Supervisors* (1977) 73 Cal.App.3d 218, 227 [139 Cal.Rptr. 445]; *No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223 [242 Cal.Rptr. 37].)

[6] Petitioners contend that respondents have the burden of proof in these proceedings. They cite *Morris* v. *Williams* (1967) 67 Cal.2d 733, 760-761 [63 Cal.Rptr. 689, 433 P.2d 697] and *California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637, 650-651 [106 Cal.Rptr. 555], as authority for their position.

In the *Morris* case, the Supreme Court inquired into the validity of certain amended regulations of the Health and Welfare Agency reducing benefits provided for under the California Medical Assistance Program. The trial court opinion indicated that the defendants failed to meet their burden under the Medi-Cal Program. The trial court was affirmed.

In *California Medical Assn.*, the trial court entered a judgment declaring invalid certain Medi-Cal regulations promulgated by the State Director of Health Care Services. The appellate court affirmed. The trial court found that defendants had the burden of proof. Defendants contended "this was error since the burden of proving their case rest with plaintiffs (CMA and O'Reilly) throughout the case." The appellate court agreed with the trial judge.

Both cases dealt with the issue of which side had the burden of proof on certain matters at the trial level. Neither case is applicable here.

[7] "In any action or proceeding, other than an action or proceeding under section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.)

The report of the Long Beach Department of Planning to the Long Beach City Council consisted of a policy recommendation by the city's planners that the project should be aligned along the so-called "River Route" rather than along Long Beach Boulevard.[8]

After considerable discussion, the city council made a policy decision to recommend adoption of the Long Beach Boulevard routing. That recommenation was forwarded to LACTC.

Respondents contend that the staff report was not essential to the deliberations of LACTC because it repeated information which was already before that agency. Petitioners concede that this might be true. But they insist that they were fundamentally prejudiced because the actual staff recommendation was not before LACTC.

Petitioners must demonstrate that the record lacks substantial evidence to support the findings of the lower court.[9] They fail to do so. To support their position petitioners place reliance on three California cases and one federal case. The California cases[10] deal with situations which are factually

---

[8] The document states in part, as follows: "Staff believes that the two primary alternatives offer distinctly different types of transit service to Long Beach, and that the choice between them becomes primarily a policy question rather than a technical matter. This opinion is shared by the staff of LACTC, which concluded in their recent Alternative Evaluation— Long Beach report that 'selection of a project alignment in Long Beach must be based on policy choices, as it is not possible to adequately distinguish among at least two of the candidates on the basis of technical data and public comment alone.' "

[9] ". . . the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record." (Pub. Resources Code, § 21168.)

[10] In *People v. County of Kern* (1974) 39 Cal.App.3d 830 [115 Cal.Rptr. 67], the Kern County Planning Department prepared a five-page addendum to the draft of the EIR in response to numerous comments and extensive criticism of the draft EIR. "It also prepared a two-page 'environmental impact summary' which merely contained one-paragraph statements of the major impacts on population, water supply, sewage disposal, air pollution, geologic hazard, wildlife and access-circulation. . . . [T]he board of supervisors ordered the two-page summary to be made a part of the final EIR. . . . Neither the planning department's five-page addendum nor the two-page summary contain[ed] a response by the County to the significant environmental issues raised, nor [did] they address in any detail the reasons why the specific comments and objections received from the interested agencies and private groups were not accepted, and why the board apparently concluded that the value of the development warranted an override of the environmental objections." (*People v. County of Kern, supra,* p. 836.)

In *People v. County of Kern* (1976) 62 Cal.App.3d 761 [133 Cal.Rptr. 389], the court was again confronted with the matters involved in the earlier case. Again, the board of supervisors failed to adequately respond to environmental criticisms that there would not be adequate water if a high density development project were permitted. "First the board has failed to identify in any manner the data available to it upon which it reaches its conclusion that the water supply is adequate for the projected needs of the high density development. This becomes particularly important in view of the public agencies' statements that underground

different from those in the case at bench; the federal case[11] remanded the matter back to the trial court for elaboration and clarification of its findings.

Even if it was error for LACTC to act without considering the staff report, LACTC had the information and we are satisfied that the staff document would not have added anything new. (Cf. *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 285 [152 Cal.Rptr. 585].)

---

water studies are needed to evaluate the project. At the very minimum the board should have ascertained the productive capacity of the three wells on the property and should have evaluated their capacity with the anticipated needs of the project. It also should have considered the level of the underground water tables at the present time in comparison with the level of the water tables in 1971. The fact that owners prior to 1971 were able to raise turkeys on the property is no proof that the water supply will be sufficient for a high density residential development in future years.

". . . . . . . . . . . . . . . . . .

"The availability of an adequate underground water supply for the proposed project and the availability of an alternate source of water by importation from other areas and its effect on the existing water users in the area is a matter of serious environmental concern. It is a matter of common knowledge that the existing limited underground water supply in most areas in California is threatened by increased residential development. Thus, the problem must be squarely faced by public agencies in deciding whether to approve a project." (Fn. omitted.) (*People* v. *County of Kern, supra,* p. 772-773.)

In *Cleary* v. *County of Stanislaus, supra,* 118 Cal.App.3d 348, the court found that the response to the comments by the Air Resources Board to a draft environmental impact report concerning zoning changes was nonspecific and general, stating, among other things, that it was not one of its concerns, and stating in a conclusional form that "the increase in traffic generated by the proposed use is insignificant." The Air Resources Board expressed specific concern regarding the effect of additional emissions from development of the site and increased automobile traffic. " ' ". . . A conclusory statement, 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind' not only fails to crystalize issues [citation] but 'affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives.' [Citation.]" ' " *Cleary* v. *County of Stanislaus, supra,* at p. 358.)

[11] In *Silva* v. *Lynn* (1st Cir. 1973) 482 F.2d 1282, the district court considered only the final statement, the draft statement and comments filed thereto, certain affidavits and testimony taken in court. It refused appellants' request that the administrative record be produced. Yet that record contained more detailed studies and background of deliberation which formed the basis of the final environmental impact statement. The appellate court was of the opinion that federal law required production to the lower court of the entire administrative record. Therefore, the court remanded to the district court with instructions that it return the final environmental impact statement to the Department of Housing and Urban Development, requesting it to supply more detailed reasons supporting its conclusions. "We would not contemplate that the district court, in the absence of special circumstances which we cannot now foresee, would have the need to take more evidence. But we do not attempt to prejudge. (See, e.g., *Allison* v. *Froehlke* (5th Cir. 1972) 470 F.2d 1123.) Upon the presentation of an amended Final Statement, together with the administrative record to date, which we think is required, we would hope that the court could come to a fairly rapid conclusion as to the validity of the statement." (*Silva* v. *Lynn, supra,* at p. 1288.)

*Has the Project Been Changed in a Way Sufficient to Require a New EIR? No.*

■ Petitioners assert that respondents' EIR did not present a realistic evaluation or detailed assessment of the service benefits or the traffic impacts of the Project. They claim that the period for constructing the rail system in Long Beach has "expanded" from a range of 20 to 30 months (as estimated in the EIR) to four years. Petitioners claim that this would result in an added threat to their businesses and require a new EIR under Public Resources Code section 21166 and state CEQA Guidelines (Cal. Admin. Code, tit. 14, § 15162).

Supporting evidence submitted to the court consisted of a congratulatory letter[12] and the informal two-page memorandum prepared by Daniel Caulfield.[13]

The SEIR projected that construction of the rail system on Long Beach Boulevard would require approximately 20 to 30 months. This was consistent with the projection in the SEIR that "Primary Construction Activity Disruptive to Businesses" would last 20 to 24 months. The construction contemplated by the EIR would cover 20 to 30 months including utility, rail, and station construction.

Neither the Bacharach letter nor the memorandum assists petitioners in their contention that construction time would take four years and that, therefore, a new EIR is required.

The trial court's ruling is supported by substantial evidence.

---

[12] This document is a form letter dated May 21, 1985, to persons who had testified at the various public hearings conducted during preparation of the EIR for the entire Project. The letter, signed by Ms. Jacki Bacharach, chairwoman of LACTC, contained the statement that "construction on the project is scheduled to begin this fall, and should take approximately four years."

The trial court refused to read the Bacharach letter as stating that construction of the rail system in Long Beach would take four years. We have independently read the document and view the trial judge's interpretation as appropriate.

[13] Item 4 of the agenda presented a rough estimate of the total period of time from initiation of utility work to the conclusion of landscaping in the vicinity of tracks in Long Beach. Caulfield indicated that the first utility work could begin in December 1986, and that light rail service would commence in October 1989. However, actual obstructive construction on Long Beach Boulevard would occur between December 1986 and June 1988—a period within the 20-to-30-month range.

*Does the EIR Adequately Study the "Realistic" Benefits of the Project, Its Economic Impacts, and Its Effects On Rush-hour Traffic? Yes.*

### A. Ridership Estimates.

Petitioners challenge the accuracy of the ridership estimates contained in the EIR on the grounds that they are inconsistent with estimates of another agency. ■ CEQA does not provide a forum for attacking the policy decision to proceed. Nor do disagreements among experts require the invalidation of an EIR. (CEQA Guidelines, Cal. Admin. Code, tit. 14, § 15151; *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].)

### B. Peak-Hour Traffic Impacts on Long Beach Boulevard.

■ Throughout the environmental study process for the rail transit Project, potential traffic impacts were a major consideration for LACTC. The SEIR contained a specific analysis of current and projected (year 2000) peak hour traffic volumes and volume to capacity (V/C) ratios of the 33 signalized intersections affected by the Long Beach alternatives, 15 of which were on Long Beach Boulevard between Willow Street and First Street.

The study showed the current situation and the state of peak hour traffic in the year 2000 with and without the Project. The data led to the conclusion that the impact of the Project on V/C ratio levels of service would be minimal.

Further, the SEIR indicated that some traffic impacts could occur at intersections with left-turning traffic crossing the light rail transit tracks.[14]

Prior to drafting of the FEIR, the LACTC prepared a document entitled, "Optional Configuration for LB-5 in Response to Comments by the City of Long Beach to the Draft Supplemental EIR." This document described the proposals discussed by LACTC and Long Beach to mitigate traffic and other Project impacts on Long Beach Boulevard. These matters were addressed in the FEIR.

The trial court's ruling is supported by substantial evidence.

---

[14] It should be noted that traffic mitigation measures are described, including the modification of traffic signal phases to accommodate possible left-turn conflicts with rail transit vehicles and the inclusion of other mitigation measures, as part of the city's "Transportation System Management (TSM)" program.

### C. Economic Impacts.

■ CEQA does not require an analysis of social or economic impacts. (CEQA Guidelines, Cal. Admin. Code, tit. 14, §§ 15131, 15131, subd. (a).) Nevertheless, these impacts of construction and operation of the Project were considered in-depth in the environmental documents. The documents recognized that there would be a disruption of local businesses because of the construction along Long Beach Boulevard. Economic impacts were specifically set out in the SEIR. As a result of these considerations, mitigation measures incorporated in the final Project include maintaining access on Long Beach Boulevard during construction, keeping at least one lane open in each direction at all times, keeping block closures to a minimum, providing temporary signing, and maintaining pedestrian access to businesses.

Further, the documentation recognized that some impacts could not be avoided. LACTC adopted a "Statement of Overriding Considerations," concluding that the merits of the Project outweighed the potential adverse short-term economic impact.

Petitioners fail to demonstrate that LACTC did not comply with CEQA requirements.

*Does the EIR Adopt Effective Mitigation Measures to Avoid Adverse Effects? Yes.*

■ The principal purpose of an EIR is to inform decisionmakers of the potential environmental impacts of a project. The EIR is required to identify possible ways to minimize significant effects. Mitigation measures are suggestions which may or may not be adopted by the decisionmakers. There is no requirement in CEQA that mitigation measures be adopted. The adoption of mitigations depends, among other matters, upon economic and technological feasibility and practicality. (CEQA Guidelines, Cal. Admin. Code, tit. 14, § 15121.)

■ In this case an extensive list of mitigations was considered and numerous methods to improve the Project were adopted. Findings as to each were made.

Petitioners enumerate several additional mitigation measures described in the environmental documents and claim that implementation of these measures is necessary if the conclusions of the EIR as to the environmental impacts of the projects are to prove correct. All of these arguments were

made elsewhere. The contentions were considered and ruled upon by LACTC.

The trial court concluded that LACTC fully satisfied CEQA's requirements regarding the consideration and adoption of feasible mitigation measures. There was substantial evidence to support that ruling.

### *Did LACTC Fail to Make Required Findings in Support of the Selected Route? No.*

■ The purpose of an EIR is to describe and analyze the environmental impacts of a particular project. If an EIR concludes that a project will result in significant environmental effects, CEQA requires that the public agency make findings as to each of the impacts. (Pub. Resources Code, § 21081; CEQA Guidelines, Cal. Admin. Code, tit. 14, § 15091.)

Findings are required only for environmental impacts; they are not required for policy decisions. Further, once the required findings as to environmental impacts have been made, a public agency may still adopt a project with adverse environmental consequences, provided it either adopts mitigation measures or finds that overriding considerations justify the project notwithstanding unmitigated adverse consequences. (CEQA Guidelines, Cal. Admin. Code, tit. 14, §§ 15092, subd. (b)(2)(B) and 15093.)

■ Petitioners contend that LACTC's decision should be remanded for further findings as to why LACTC considered the Long Beach Boulevard alternative to be preferable to other alternative routings. To support their position petitioners rely on *Topanga Assn. for Scenic Community* v. *County of Los Angeles, supra*, 11 Cal.3d 506, and *Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886 [236 Cal.Rptr. 794].

In *Topanga,* petitioners sought a writ of administrative mandamus under Code of Civil Procedure section 1094.5, challenging an administrative adjudication granting a zoning variance for development in the Santa Barbara Mountains. The administrative agency failed to make findings as to pertinent facts and failed to apply the standards upon which it was permitted to issue a variance to the facts. The Supreme Court concluded that lower courts could not effectively review such adjudicative determinations by administrative mandamus unless the agency made findings on the facts

pertinent to its determination and described how the findings supported the agency's determination.[15]

But this case is distinguishable from *Topanga*. In *Topanga*, ". . . the granting of a variance by the County of Los Angeles was invalidated on the ground that no findings were made showing the existence of circumstances authorizing a variance under the provisions of Government Code section 65906 permitting variances ' "*only* when, because of *special* circumstances applicable to the property, . . . the strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification." (Italics added.)' (11 Cal.3d at p. 520.) The court analyzed certain 'factual data' in the planning commission's summary and noted (*id.,* at pp. 520-521): 'The data contained in the planning commission's report focus almost exclusively on the qualities of the property for which the variance was sought. In the absence of comparative information about surrounding properties, these data lack legal significance. Thus knowledge that the property has rugged features tells us nothing about whether the original real property in interest faced difficulties different from those confronted on neighboring land. Its assurances that it would landscape and terrace parts of the property and leave others in their natural state are all well and good, but they bear not at all on the critical issue whether a variance was necessary to bring the original real party in interest into substantial parity with other parties holding property interests in the zone. [Citations.]'

"The holding in *Topanga* was, thus, that *in the total absence of findings in any form on the issues supporting the existence of conditions justifying a*

---

[15] "We hold further that a reviewing court, before sustaining the grant of a variance, must scrutinize the record and determine whether substantial evidence supports the administrative agency's findings and whether these findings support the agency's decision. In making these determinations, the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision.

". . . . . . . . . . . . . . . . . .

"Among other functions, a findings requirement serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. [Citations.] In addition, findings enable the reviewing court to trace and examine the agency's mode of analysis. [Citations.]

"Absent such roadsigns, a reviewing court would be forced into unguided and resource-consuming explorations; it would have to grope through the record to determine whether some combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate order or decision of the agency. Moreover, properly constituted findings enable the parties to the agency proceeding to determine whether and on what basis they should seek review. [Citations.] They also serve a public relations function by helping to persuade the parties that administrative decision-making is careful, reason, and equitable." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at pp. 514-517.)

*variance,* the granting of such variance could not be sustained." (Italics added.) (*Jacobson* v. *County of Los Angeles* (1977) 69 Cal.App.3d 374, 389 [137 Cal.Rptr. 909].)

In *Resource Defense Fund* plaintiffs sought a writ of mandate to compel a county local agency formation commission to set aside its approval of an annexation on the ground that CEQA had been violated. The trial court held that the EIR was defective, but determined that the commission's violation of the act was "harmless error." "[T]he conventional 'harmless error' standard has no application when an agency has failed to proceed as required by CEQA. [Citation.] Failure to comply with CEQA procedures is necessarily prejudicial." (Pp. 897-898.) In the case at bench, however, the trial court found no error. The policy considerations upon which LACTC adopted the Long Beach Boulevard alternative were clearly enunciated in the record.

" 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]

" '[A] "major purpose of an EIR is to inform other government agencies, and the public generally, of the environmental impact of a proposed project [citations]. . . ." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 86 [118 Cal.Rptr. 34, 529 P.2d 66]) and to inform the decision-making agency of the full range of adverse environmental effects and alternative measures prior to its decision to approve or disapprove such project [citations], the underlying policy of the act to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decision" [citation], dictates that the "initial and primary responsibility for striking [the necessary] balance between competing concerns must rest with the [decision-making] agency itself, . . ." [citations] and whose consideration cannot be merely a "post hoc rationalization" of a decision already made. [Citations.]' (*Mt. Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 36-37 [143 Cal.Rptr. 365].)" (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees, supra,* 89 Cal.App.3d at p. 284.)

Petitioners seek to impose a virtually impossible standard upon those charged with making decisions. But, "[a]bsolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned. It is only required that the officials and agencies make an objective, good-faith effort to comply. That requires a 'hard look' at environmental consequences. . . ; the court does not seek to impose unreasonable extremes

or to interject itself within the area of discretion as to the choice of the action to be taken. [Citations.]

"When the alternatives have been set forth in this manner, an EIR does not become vulnerable because it fails to consider in detail each and every conceivable variation of the alternatives stated. [Citations.]" (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees, supra,* 89 Cal.App.3d at pp. 287-288.)

Moreover, where, as here, a reviewing court explores in detail the record presented in order to achieve a comprehensive review of the case, the considerations enunciated in *Topanga* are inapplicable. (Cf: *Residents Ad Hoc Stadium Com.* v. *Board of Trustees, supra,* 89 Cal.App.3d at p. 283.) The documentation before us contains detailed and specific analyses upon which LACTC predicated its summaries of the environmental impacts of the project. Petitioners fail to show a basis for overturning LACTC's determination.

*Were the Petitioners Wrongfully Precluded From Completing Discovery? No.*

 Prior to trial, petitioners noticed depositions of numerous LACTC officials. Respondents sought a protective order and the trial court determined that depositions were inappropriate but permitted all other forms of discovery. Nothing in the order suggested that if other discovery proved to be inadequate, petitioners' request for depositions could not have been renewed.

Thereafter, petitioners sought a writ of mandate to compel discovery. This court issued a memorandum decision denying the writ which stated in part, as follows: "The order with which petitioners take issue is a narrowly drawn protective order which prohibits petitioners from obtaining certain information by way of deposition. The information may still be obtained by less intrusive means of discovery such as interrogatories, request for production, or request for admissions."

Petitioners sought no review in the state Supreme Court. Thereafter, they did pursue other discovery.

But at trial, without making additional discovery motions or making any showing that real prejudice had earlier resulted, petitioners claimed that they had been deprived of the right to conduct full discovery by reason of the trial court's limited protective orders.

We do not agree with petitioners' contention. They could have mooted the issue by pursuing other forms of discovery.

Our order of August 9, 1985, was intended to be a decision on the merits with its unequivocal suggestion to appellants as to how they might further proceed. "The rule is well settled that a denial by . . . the appellate court of an application for a writ without opinion 'is not res judicata of the legal issues presented by the application unless the *sole possible* ground of denial was that the court acted on the merits, or unless it affirmatively appears that such denial was intended to be on the merits.' [Citations.]" (*Hagan* v. *Superior Court* (1962) 57 Cal.2d 767, 770 [22 Cal.Rptr. 206, 371 P.2d 982].)

Even if our decision had not been on the merits, we have again reviewed the file in this case and are of the opinion that appellants have made no meritorious showing that real prejudice, as opposed to hypothetical prejudice, has resulted to them as a result of the trial court's ruling.

The judgment is affirmed.

Feinerman, P. J., and Ashby, J., concurred.