62 Cal.Rptr.3d 651 (2007)
153 Cal.App.4th 238
VINEYARD AREA CITIZENS FOR RESPONSIBLE GROWTH, INC., et al., Plaintiffs and Appellants,
v.
CITY OF RANCHO CORDOVA, Defendant and Respondent; Sunrise Douglas Property Owners Assn. et al., Real Parties In Interest and Respondents.
No. C044653.
Court of Appeal of California, Third District.
June 13, 2007.
As Modified on Denial of Rehearing July 13, 2007.
*654 Stephan C. Volker, San Francisco, Gretchen E. Dent, San Jose, Joshua A.H. Harris, Oakland and Marnie E. Riddle for Plaintiffs and Appellants.
Steven R. Meyers, City Attorney; Meyers, Nave, Riback, Silver & Wilson, Andrea J. Saltzman and Julia L. Bond, Oakland, for Defendant and Respondent.
Remy, Thomas, Moose and Manley, James G. Moose and Sabrina V. Teller, Sacramento, for Real Parties in Interest and Respondents.

OPINION ON REMAND
MORRISON, J.
This land-use case raises claims under the California Environmental Quality Act ("CEQA"; Pub. Resources Code, § 21000 et seq.), the Planning and Zoning Law (Gov.Code, § 65000 et seq.) and the public trust doctrine.
Vineyard Area Citizens for Responsible Growth, Inc. and others (collectively, petitioners) challenged the approval by Sacramento County (County) of a project proposed by AKT Development Corp. and others (collectively, Developer). The newly formed City of Rancho Cordova (City) succeeded to the County's interest in this case and appears as the sole governmental respondent.
The trial court denied the petition to overturn the County's approval of the Sunrise Douglas Community Plan and Sun-Ridge Specific Plan (collectively, Project) and petitioners filed a timely notice of appeal.
In our initial opinion we agreed with the Developer that the CEQA arguments lack merit and we agreed with the City that the zoning and public trust claims lack merit. Accordingly, we affirmed the judgment. The California Supreme Court granted review and concluded that some of the CEQA arguments had merit. (Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova (2007) 40 Cal.4th 412, 53 Cal.Rptr.3d 821, 150 P.3d 709 (Vineyard).) Accordingly, the cause was remanded to us "for further proceedings consistent with this opinion." (Id. at p. 450, 53 Cal.Rptr.3d 821, 150 P.3d 709.) Consistent with that directive, we remand with directions to the trial court to grant the petition for a writ of mandate to compel further environmental review, in accordance with the California Supreme Court's opinion.

BACKGROUND
Judge Cadei summarized the gist of the case thus:
"This is a proceeding under Code of Civil Procedure sections 1085 and 1094.5 in which petitioners challenge the actions of the [County] approving a longrange community plan and a nearer-term specific plan (collectively, "the project") to govern development of the so-called Sunrise Douglas and SunRidge areas in eastern Sacramento County. The 6,015-acre area covered by the project now consists primarily of rural open space, and contains some environmentally sensitive features such as wetlands, seasonal creeks and vernal pools. [Developer] ultimately propose[s] to urbanize the area by developing it with a mix of residential and commercial uses, including up to 22,500 dwelling units. Urbanization on such a scale inevitably brings with it environmental and social impacts, which can generate significant *655 opposition. This project has not avoided creating some controversy. Notably, during the course of environmental review of the project, it became necessary to completely restructure the original water supply plans for the project as the result of groundwater contamination originating from the Aerojet site, which lies north of the plan area. The undeniable environmental impacts of the project, along with the still-vexing water supply issues, are at the heart of this proceeding."
A Draft Environmental Impact Report (DEIR) was released in March 1999, and in May 2001 a different water supply plan was included in a revised recirculated DEIR (RRDEIR). The Final EIR (FEIR) was published in November 2001 and after several hearings the County certified it on June 19, 2002.
On July 17, 2002, the County passed resolutions (Nos.XXXX-XXXX, XXXX-XXXX and XXXX-XXXX) and ordinances (Nos. SZC XXXX-XXXX and SZC XXXX-XXXX) that amended the general plan and zoning to approve the Project. In connection therewith the County issued a statement of findings which, exclusive of supporting documentation, exceeded 150 pages of detailed analysis.
On August 19, 2002, petitioners filed a petition for writ of mandate. A judgment denying their petition was entered on June 30, 2003, and petitioners filed this appeal on July 30, 2003.

STANDARD AND SCOPE OF REVIEW
In CEQA cases a court decides whether "the agency has not proceeded in a manner required by law" and "the act or decision is supported by substantial evidence in the light of the whole record." (Pub. Resources Code, §§ 21168, 21168.5; see Neighbors of Cavitt Ranch v. County of Placer (2003) 106 Cal.App.4th 1092, 1099-1100, 131 Cal.Rptr.2d 379.) "The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision." (Save Our Peninsula Committee v. Monterey County Bd. of Supervisors (2001) 87 Cal.App.4th 99, 117, 104 Cal. Rptr.2d 326.) Accordingly, the burden is on the challenger. (Barthelemy v. Chino Basin Mun. Water Dist. (1995) 38 Cal. App.4th 1609, 1617, 45 Cal.Rptr.2d 688 (Barthelemy).)
Except as otherwise provided (e.g., Pub. Resources Code, §§ 21167.1, subd. (a) [calendar preference], 21167.6, subd. (h) [restricting briefing extensions]) CEQA appeals are subject to normal appellate rules. (See 2 Practice under CEQA (Cont.Ed.Bar 2003) Judicial Review, §§ 23.136, 23.140; 1 Cal. Environmental & Land Use Practice (Lexis/Nexis 2003) Judicial Review, §§ 12.70, 12.89; e.g., County of Amador v. El Dorado County Water Agency (1999) 76 Cal.App.4th 931, 962, fn. 15, 91 Cal.Rptr.2d 66 (County of Amador); Barthelemy, supra, 38 Cal.App.4th at p. 1613, fn. 2, 45 Cal.Rptr.2d 688.)
In non-CEQA cases we have held that an appellant's duty to comply with procedural requirements increases with the size and complexity of the record. (Paterno v. State of California (1999) 74 Cal.App.4th 68, 76, 87 Cal.Rptr.2d 754; Akins v. State of California (1998) 61 Cal.App.4th 1, 17, fn. 9, 71 Cal.Rptr.2d 314.) "Under the best of circumstances, [CEQA cases] are complicated." (County of Amador, supra, 76 Cal.App.4th at p. 939, 91 Cal.Rptr.2d 66.) Here, the administrative record is over 25,000 pages long.
Many cases observe that CEQA appeals review the legality of an entity's actions de novo and that the trial court's views are *656 not binding. (E.g., Planning & Conservation League v. Department of Water Resources (2000) 83 Cal.App.4th 892, 912, 100 Cal.Rptr.2d 173.) This does not mean an appellate court reviews legal issues not properly raised. Specifically, in a non-CEQA case we observed that "legal issues arise out of facts, and a party cannot ignore the facts in order to raise an academic legal argument." (Western Aggregates, Inc. v. County of Yuba (2002) 101 Cal.App.4th 278, 291, 130 Cal.Rptr.2d 436 (Western Aggregates).)
We agree with Developer that petitioners do not fairly state the facts and have therefore forfeited many of their claims. For example, they imply the Project will destroy farmland and "obliterate" "irreplaceable wetlands". Although some land is farmed and some has vernal pools, all has been in the general plan's "Urban Growth Area" since 1993, only "isolated" pieces of farmland are considered "prime" and those are too small "to be farmed on a practical basis," and wetlands loss will be mitigated by a preserve and offsite restoration. As another example, petitioners claim the Project will "obliterate" Morrison and Laguna Creeks. Such hyperbole is unsupported by the record, which shows these "are normally dry creek beds" and that the Project as approved preserves Laguna Creek by creating an open space corridor, and that Morrison Creek crosses "a small portion" of a corner of the Project land which will be subject to a site-specific design process subject, inter alia, to approval by the Department of Fish and Game. Petitioners do not have to believe the County's evidence, but as appellants they have a duty to confront it. As Developer and the City point out, petitioners make many such misstatements and omissions.
In non-CEQA appeals, the lack of a fair statement of facts forfeits evidentiary claims. (Foreman & Clark Corp. v. Fallon (1971) 3 Cal.3d 875, 881-882, 92 Cal.Rptr. 162, 479 P.2d 362; Western Aggregates, supra, 101 Cal.App.4th at pp. 290-291, 130 Cal.Rptr.2d 436.) The same is true in CEQA cases. (Markley v. City Council (1982) 131 Cal.App.3d 656, 673-674, 182 Cal.Rptr. 659; Cleary v. County of Stanislaus (1981) 118 Cal.App.3d 348, 360, 173 Cal.Rptr. 390; see No Slo Transit, Inc. v. City of Long Beach (1987) 197 Cal.App.3d 241, 250, fn. 5, 242 Cal.Rptr. 760.)
In this case, "Instead of a fair and sincere effort to show that the trial court was wrong, appellant's brief is a mere challenge to respondents to prove that the court was right. ... An appellant is not permitted to evade or shift his responsibility in this manner." (Estate of Palmer (1956) 145 Cal.App.2d 428, 431, 302 P.2d 629.)
If petitioners assumed that because we review the legal issues de novo, they did not have to paint the facts fairly, they are wrong. In summary judgment cases, which we review de novo, an appellant must present an objective statement of evidence on which the trial court ruled. (Lewis v. County of Sacramento (2001) 93 Cal.App.4th 107, 112-114, 113 Cal.Rptr.2d 90.) [omission]
Further, petitioners do not acknowledge the existence of the trial court's decision. We agree that the trial court's decision is not "binding" because we review "the agency's action, not the trial court's decision[]" (Vineyard, supra, 40 Cal.4th at p. 427, 53" Cal.Rptr.3d 821, 150 P.3d 709), but that does not make the trial court's decision irrelevant. (See Uriarte v. United States Pipe & Foundry Co. (1996) 51 Cal.App.4th 780, 791, 59 Cal.Rptr.2d 332 ["The fact that we review de novo a grant of summary judgment does not mean that the trial court is a potted plant *657 in that process"].) Treating de novo review as if the trial court's ruling in a CEQA case is merely a ticket of admission to the Court of Appeal improperly denigrates the trial court's role. (See Koster v. County of San Joaquin (1996) 47 Cal. App.4th 29, 44-5, 54 Cal.Rptr.2d 565 ["in many [CEQA] cases, trial courts provide us with a thorough written opinion which helps to clarify issues for appeal"] (Koster).) [omission]
Developer and the City exhaustively detailed the evidence supporting the County's and Judge Cadei's decisions and petitioners failed to file a reply brief. Because petitioners failed to state the facts fairly as to some of the issues they raise, we concluded some of their claims have been forfeited. However, we addressed on the merits the water supply issues deemed dispositive by the California Supreme Court and those issues necessarily dictate the result on remand.

DISCUSSION

I. CEQA Water Issues.

In separate but related claims petitioners assert the Project should not have been approved because the County did not ensure there is an adequate water supply, and a critical component of the Project, the new well field, will have significant environmental impacts, such as spreading perchlorate and drying up wetlands.
The California Supreme Court concluded that the FEIR's analysis of the near-term water supply was adequate, but its analysis of long-term water-supply was not:
"Procedurally, the FEIR improperly purports to tier from a future environmental document, the pending Zone 40 master plan analysis. The FEIR also fails to properly incorporate or tier from the impact and mitigation discussion of the Water Forum proposal and hence to include in the present project enforceable mitigation measures for the large new surface water diversions proposed. Finally, it relies on a provision for curtailing later stages of development if water supplies do not materialize without disclosing, or proposing mitigation for, the environmental effects of such truncation. Factually, the FEIR's use of inconsistent supply and demand figures, and its failure to explain how those figures match up, results in a lack of substantial evidence that new surface water diversions are likely to supply the project's long-term needs. We think that with approval at stake of a development project ultimately expected to use more than 22,000 afa of wateralmost 4 percent of the entire County's projected urban demand in the year 2030CEQA entitles the decision makers and the public to a legally proper procedure and to a clearer, more coherent and consistent explanation of how, given the competing demands expected to arise for new water supplies, water is to be provided to the project." (Vineyard, supra, 40 Cal.4th at p. 447, 53 Cal.Rptr.3d 821, 150 P.3d 709.)
The court also concluded that the analysis of the effects on the Cosumnes River was not adequate:
"In this case, the draft EIR contained no discussion of the impact the planned groundwater extraction at the Well Field would have on water flows and habitats in the Cosumnes River. When several agencies and private organizations commenting on the draft EIR raised concerns regarding such effects and the resulting impacts on salmon migration, County staff responded in the FEIR that, due to restrictions on the amount of water to be pumped from the Well Field and the limited hydrological *658 connections between the Cosumnes River and the aquifer from which water would be taken, the impact on Cosumnes River flows would be small and insignificant. The County adopted that conclusion in its findings approving the project.
"Plaintiffs contend, and we agree, that the County's finding is not supported by substantial evidence because the FEIR discloses a potentially significant impact of reduced river flows on aquatic species, including migrating salmon.[fn.] While concluding the effect of further groundwater withdrawals was likely to be small and therefore generally insignificant, the FEIR authors included this proviso: `The potential exception could be during periods of very low flow. During such periods of low flow, these depletions could change the timing and areal extent of the dewatering of the stream invert, potentially impacting aquatic and riparian-dependent species and habitat.'
"Though phrased as a limited exception to the conclusion of insignificance, this reservation appears instead to identify a substantial, or at least potentially substantial, new impact. That is because 'periods of very low flow' are precisely those in which, according to comments on the draft EIR by the United States Fish and Wildlife Service and the Nature Conservancy, migratory fish, waiting in the fall for streamflows to rise to sufficient levels, are likely to be adversely affected by further dewatering. The potential adverse change identified by the FEIR in `the timing and areal extent of the [Cosumnes's] dewatering' is impossible to distinguish from the barrier to migration caused, according to the Nature Conservancy's comment, when the Cosumnes River `ceases flowing earlier in the year, stays dry longer into the Fall, and dries over an increasingly long reach....'
"Moreover, the area of the Cosumnes River in which the FEIR projects potential loss of flow overlaps with the river's migratory reach. The Fish and Wildlife Service comment identifies the migratory reach as `from the tidal zone to La-Trobe Rd.,' a reach that includes both of the areas identified by the FEIR as having a hydrological connection to the lower aquifer (`to the east of Dillard Road and to the west of Twin Cities Road).[fn.]
"Thus, in response to comments raising the issue of an impact on salmon migration in the Cosumnes River, the FEIR states, in effect, that loss of flow to that river is likely to be small and therefore insignificant except that the river might remain drier longer in the yearincluding when the salmon would be migratingand over a longer reachincluding where the salmon would be migrating. We do not consider this response substantial evidence that the loss of stream flows would have no substantial effect on salmon migration. Especially given the sensitivity and listed status of the resident salmon species, the County's failure to address loss of Cosumnes River stream flows in the draft EIR `"deprived the public ... of meaningful participation"' [citation] in the CEQA discussion. [Citation.]
"Real parties and Rancho Cordova point out that the FEIR `contemplated additional environmental review of the Cosumnes River issue in the then-pending' Zone 40 master plan EIR. But as we explained in part I. above, analysis of the project's impacts could not be deferred in this manner. An EIR cannot be tiered from another EIR if the latter is not yet complete.

*659 "The burden of recirculating a draft EIR, we note, may be limited by the scope of the revisions required. `If the revision is limited to a few chapters or portions of the [draft] EIR, the lead agency need only recirculate the chapters or portions that have been modified.'" (Vineyard, supra, 40 Cal.4th at pp. 448-449, 53 Cal.Rptr.3d 821, 150 P.3d 709.)
Accordingly, the petition for writ of mandate must be granted compelling revision and recirculation of the draft EIR to address the issues of long-term water supply and the effect of the project on the Cosumnes River, as stated above.
Petitioners raised some other issues touching on water quality and supply which we rejected in our original opinion, including a claim that the public trust doctrine (see Cal. Const., art. I, § 25, art. X, §§ 2 & 4; Personal Watercraft Coalition v. Marin County Bd. of Supervisors (2002) 100 Cal.App.4th 129, 140, 144-145, 122 Cal. Rptr.2d 425) was violated by the potential "dewatering" of the Cosumnes River, which would among other things impact salmon habitat. However, because further environmental review will be conducted as a result of the remand, which will include further consideration of the effect of the Project on salmon habitat, as described earlier in this opinion, discussion of these points would be premature.

II. CEQA Mitigation Measures.

Petitioners claim the County violated CEQA by rejecting two mitigation measures, referred to in the record as Alternative 3A and Alternative 3B. It appears that this argument is not entirely mooted by the need for a remand.
"An EIR must `describe a range of reasonable alternatives to the project ... which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives.' [Citation.] It must contain `sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison with the proposed project.' [Citation.] `The statutory requirements for consideration of alternatives must be judged against a rule of reason.'" (Association of Irritated Residents v. County of Madera (2003) 107 Cal.App.4th 1383, 1400, 133 Cal.Rptr.2d 718 (AIR).) A public entity may decide that a proposed alternative which reduces significant impacts is infeasible provided it gives a rational explanation supported by substantial evidence. (San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus (1994) 27 Cal. App.4th 713, 737-739, 32 Cal.Rptr.2d 704.) Petitioners emphasize the EIR did not make the same infeasibility findings made by the County. However, the County had the duty to make its own findings and it was not bound by staff analysis. (Protect Our Water v. County of Merced (2003) 110 Cal.App.4th 362, 372, 1 Cal.Rptr.3d 726.)
Alternative 3A contemplated an on-site wetlands preserve which eliminated many dwelling units and commercial space. According to the FEIR, "General Plan consistency would improve with regard to on site biological mitigation, however, this Alternative presumably creates a fundamental inconsistency with the County's determination that this should be an area of growth and development to accommodate projected population growth." The County concluded Alternative 3A was infeasible because it would conflict "with the stated goal of improving the housing/jobs balance within the Highway 50 corridor" and provide "no obvious biological benefit for doing so" and the fewer units would increase the cost of each unit and of project financing, making it economically infeasible.
*660 In concluding Alternative 3A gave no superior biological advantage the County's findings cite to evidence not mentioned by petitioners. We have nonetheless looked at the record, which includes an analysis by a qualified expert who explained in detail why an on-site preserve was not biologically superior. In short, after discussing the way in which vernal pools were distributed on the site, he concluded (referring to both Alternatives 3(A) and 3(B): "Any on-site preserves in the plan areas would ultimately be in an urban setting, and offsite mitigation for wetland preservation and construction will have to be done, regardless of the preserve configuration. Given these considerations, it makes far more sense to combine mitigation requirements in larger, offsite preserves, remote from urban uses, than to consume more valuable development lands with marginal mitigation." Petitioners make no argument attacking the sufficiency of this supporting evidence.
Alternative 3B also assumed an on-site wetlands preserve "but retains the same holding capacity as the proposed project by increasing development densities within the remainder of the planning area." The County found this was infeasible because it was not biologically superior and was economically infeasible because the increased density and large wetlands preserve "is unattractive to potential home buyers and very difficult to market.... Thus, the developers would be left with significant amounts of virtually unmarketable land." Further, "the large amounts of on-site preservation acreage required under the biological mitigation alternatives are ultimately inappropriate uses of land within an Urban Policy Area[.]" As the County stated elsewhere, it refused "to adopt a wetlands mitigation strategy that would place very large areas of the subject property off-limits to the very urban uses for which the property has been intended since 1993."
Judge Cadei concluded the County was "not required to re-examine fundamental land use decisions about the direction of future development that are embodied in documents such as General Plans. [Citing Citizens of Goleta Valley v. Board of Supervisors (1990) 52 Cal.3d 553, 570-573, 276 Cal.Rptr. 410, 801 P.2d 1161.]" Thus, conflicts with urbanization goals support the County's findings of infeasibility. He also found the County "cited specific written testimony submitted by experts in the real estate marketing and finance fields stating that a restructured project with increased residential densities could not be marketed successfully, and thus would not support the financing of necessary public services and infrastructure. [Citation.] Moreover, written testimony of an expert environmental consultant provided information suggesting that on-site preservation of vernal pools would be an inefficient use of land given the relatively low density of the vernal pools on the project site. [Citation.] Such testimony ... is substantial evidence supporting the ... determination that alternatives ... involving greater density were not feasible[.]"
As the Developer points out, it is not improper (nor, indeed, uncommon) for an agency to rely on economic or other technical analysis provided by a project proponent. (See AIR, supra, 107 Cal. App.4th at p. 1401, 133 Cal.Rptr.2d 718 [reliance on lender's letter and evidence by project proponent]; San Franciscans Upholding the Downtown Plan v. City and County of San Francisco (2002) 102 Cal. App.4th 656, 684, 125 Cal.Rptr.2d 745 (SFUDP).) Valuation opinions of real estate experts are accepted in CEQA cases. *661 (See SFUDP, id. at pp. 681-682, 125 Cal. Rptr.2d 745.)
Taking language from other cases out of context, petitioners fault the County for not conducting an "independent financial or economic analysis" of the alternatives. First, an EIR is not the place for a discussion of fiscal factors, that analysis is for the public agency, based on substantial evidence. (SFUDP, supra, 102 Cal. App.4th at pp. 689-692, 125 Cal.Rptr.2d 745.) Second, the cases petitioners cite do not support their claim, they simply hold that an applicant's view of economic feasibility is not determinative and the decision-maker must be provided with the basis for a feasibility opinion, so that it can make "`an independent, reasoned judgment.'" (Kings County Farm Bureau v. City of Hanford (1990) 221 Cal.App.3d 692, 735-736, 270 Cal.Rptr. 650.) To the extent petitioners extract a rule that the decision-maker cannot rely on a reasoned analysis provided by the project applicant, but must obtain "an independent feasibility analysis," they are wrong.
Tim Youmans, an urban land economist had over 23 years of experience "in real estate market research, development feasibility, and public finance," including environmental reviews. He reviewed the impact of both alternatives and concluded they "will hurt the project's ability to achieve the mix of retail and service commercial property necessary to maintain a proper balance with the residential development planned for the project." His opinion provided evidence supporting the County's conclusion of infeasibility as to both alternatives.
Doug Elmore, a real estate broker with 31 years of experience in "residential subdivision land sales to merchant home builders" in the Sacramento area, had reviewed the SunRidge specific plan and the proposed alternatives. Increasing density would degrade the ability "to build different products which appeal to different market segments. While it is theoretically possible to provide large lot `move-up' housing and still achieve the average densities set forth in ... Alternative 3(b), it would require extremely high density development on the remaining land within the Plan in order to offset any significant number of larger lots[ ]. The market for lots with [such high density] in the Sacramento region is extremely limited. Therefore, in order to achieve the required average densities under ... Alternative 3(b), the developer would be left with a significant amount of land area which would probably not be marketable either in today's market or historically, in the Sacramento region." For this reason, the alternative "would probably not be an economically feasible project and no house builder would want to compete in such a community. [¶] For these reasons, I do not believe ... Alternative 3(b) is feasible from a marketing standpoint or an economic standpoint." Elmore's resume listed several large local subdivisions he had worked on.
Petitioners call Elmore's conclusion "unsupported by any evidence" and "speculation." This claim borders on the frivolous. Elmore has been in this precise business, marketing development lots to large builders, in this geographic region, for a long time. He did not simply conclude the project was infeasible, he explained why. His expert conclusion was evidence the County could, and did, accept as true. If petitioners thought his methodology was poor, "the challenge must be raised in the course of the administrative proceedings. Otherwise, it cannot be raised in any subsequent judicial proceedings." (SFUDP, supra, 102 Cal.App.4th at p. 686, 125 Cal.Rptr.2d 745.)
*662 Because the record contains evidence supporting the County's findings that each alternative discussed on appeal was infeasible, their claims lacks merit on this record. However, the further environmental review ordered by the California Supreme Court may require reconsideration of these or other proposed mitigation measures.

III. Planning and Zoning Consistency.

Petitioners contend approval of the project was "inconsistent" with the general plan. We disagree.

A. Introduction.

As the City observes, petitioners point to isolated general plan goals, construe them in their favor, then paint the evidence in their favor to try to show the Project conflicted with those goals. This mode of argument is ineffectual. A project is "consistent" if it furthers the objectives and policies of the general plan and does not obstruct their attainment. (Families Unafraid to Uphold Rural etc. v. Board of Supervisors (1998) 62 Cal. App.4th 1332, 1336, 74 Cal.Rptr.2d 1 (FETURE).) But "General plans ordinarily do not state specific mandates or prohibitions. Rather, they state `policies,' and set forth `goals.'" (Napa Citizens for Honest Government v. Napa County Bd. of Supervisors (2001) 91 Cal.App.4th 342, 378, 110 Cal.Rptr.2d 579.) "The body that adopts general plan policies in its legislative capacity has unique competence to interpret those polices when applying them in its adjudicatory capacity. It follows that a reviewing court gives great deference to an agency's determination that its decision is consistent with its general plan. [Citation.] 'Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes.'" (Id. at p. 386, 110 Cal.Rptr.2d 579.) General plans have goals and policies relating to disparate issues, and most projects involve trade-offs among them. Such flexibility does not equate to "inconsistency." (FUTURE, supra, 62 Cal. App.4th at p. 1336, 74 Cal.Rptr.2d 1 ["A given project need not be in perfect conformity with each and every general plan policy"]; see also Karlson v. City of Camarillo (1980) 100 Cal.App.3d 789, 803,161 Cal.Rptr. 260 [that an entity's interpretation of consistency is debatable is not grounds for overturning its findings].) As in other cases, the appellant in a zoning case must paint the evidence fairly. (Jacobson v. County of Los Angeles (1977) 69 Cal.App.3d 374, 388, 137 Cal.Rptr. 909.)
The City argues the challenges raised on appeal are barred because petitioners did not exhaust their remedies. General plan issues, like CEQA issues, must be raised administratively if possible. (See Gov. Code, § 65009, subd. (b); Park Area Neighbors v. Town of Fairfax (1994) 29 Cal.App.4th 1442, 1447-1449, 35 Cal. Rptr.2d 334.) The trial court rejected the failure-to-exhaust claim. We decline to disturb the trial court's ruling on this point and will reach the merits.

B. Open Space and Conservation.

The City points out that petitioners have ignored significant parts of the general plan in arguing that the Project was inconsistent therewith. As the City points out and as Judge Cadei explicitly found, the argument that the Project violates the "open space" designation of the general plan collapses when it is recalled that the 1993 general plan does not designate this land as "open space" but as an urban growth area. As Judge Cadei found: "While [the `General Plan's Open Space *663 Element'] does refer to the open spaces of the Sunrise Douglas area in general terms, and does contain implementation policies calling for permanent protection of certain kinds of open space, nothing therein declares or mandates that the project area itself is intended to be maintained as permanent open space. Quite to the contrary, the Plan clearly designated the project area as a future `urban growth area.' At most, the Plan stated that the project site might provide `... temporary open space pending completion of urban land use and infrastructure plans.' [Citation.] The project is entirely in harmony with the Plan in this respect." Petitioners offer no refutation and we agree with Judge Cadei. Accordingly, we adopt his reasoning as our own.
Similarly, the conservation element arguments misrepresent facts that were before the County when it made its decision. We again adopt Judge Cadei's view:
"[T]he Court is not persuaded by petitioners' contention that the project is inconsistent with mandatory General Plan policies related to water, namely, staging development to match available water supplies and protecting groundwater levels. Petitioners specifically cite Conservation Element policies C0-20, C0-25 and C0-28 as the bases of their challenge. Policy CO-20 states that entitlements for urban development in new development areas shall not be granted until a master plan for water supply has been adopted by the Board and all agreements and financing for supplemental water supplies are in place. Policy CO-25 states that no building permits for urban commercial and residential uses shall be issued if the Board determines that there is a significant adverse effect on groundwater. Policy CO-28 discourages urban land uses in unincorporated areas with moderate or very high groundwater recharge capability. The project does not conflict with these policies because the mandates of policies CO-20 and CO-25 specifically have been incorporated into the project as conditions of approval and as part of the project's implementing ordinances. Moreover, as the Board correctly argues, approval of a specific or community plan is not the granting of an `entitlement' or the issuance of a building permit within the meaning of the cited policies. As policy CO-20 specifically states: `The land use planning process may proceed, and specific plans and rezoning may be approved.' The project is not fatally inconsistent with policy C0-28 because that policy does not forbid, but merely discourages, development in areas of moderate to very high groundwater recharge capability. It thus does not override the Plan's decision that the project area was a proper one for urban development. The Court thus does not find that the project conflicts with the General Plan's water-related policies.
"On the question of preservation of wetlands and vernal pools, petitioners' argument is similarly flawed. As with the Conservation Element policies discussed above, the General Plan policies mandating no net loss of wetlands and vernal pools (policies CO-62 and C0-83-87) specifically have been imposed as conditions of project approval, adopted as mitigation measures pursuant to CEQA, and written into the project's implementing ordinances. To that extent, the project clearly is not in conflict with the General Plan. Moreover, petitioners have not cited to any policy in the General Plan mandating the preservation of any specific level of wetlands or vernal pools in the project area. It is apparent from the designation of the project area for urban development, as *664 well as from the `no net loss' provisions cited above, that the Plan contemplates that some amount of wetlands and vernal pools inevitably will be lost in exchange for necessary development, but that such losses will be mitigated in other areas. The record also reveals that a preserve has been established in the project area containing at least 44 acres of wetlands. The project is thus not incompatible with the General Plan in this respect.
"With regard to the alleged inconsistency between the project and General Plan policies regarding protecting the environmental values of streams and rivers, no such inconsistency is apparent to the Court. Obviously, some alteration of Laguna and Morrison Creeks will be necessary to permit the contemplated level of urban development, but the record does not substantiate petitioners' contention that a complete `obliteration' of those creeks will occur. Once again, in light of the Plan's designation of the project area for urban development, some alteration of natural values cannot be a per se inconsistency with the General Plan. Petitioners' other contention, that extraction of groundwater to supply the project will result in the "dewatering" of the Cosumnes River during low flow periods, is not borne out by the record either. Instead, substantial evidence suggests that the river is not in hydrological contact with the groundwater basin from which the project wells will draw water except in two small areas, and that the impact on groundwater levels in those areas (and thus on the flow of the river) will be less than significant. The project thus does not violate any fundamental General Plan policies in this regard."
Nothing petitioners offer in their brief impairs Judge Cadei's holding on conservation issues, which we adopt as our own. If, however, further environmental review as ordered by the California Supreme Court reveals that new facts about the impacts of the Project, those new facts arguably could support a claim of general plan inconsistency. But it would be premature to speculate at this time what facts might or might not trigger some inconsistency with the general plan.

C. Housing Element

Government Code section 65588 states in part that a general plan's "housing element" "shall" be revised at least every five years. Petitioners, pointing out the County's housing element expired, argue no development can be "consistent" with the general plan.
Judge Cadei found: "[T]he failure to update the Housing Element by the statutory deadline does not make that element invalid. The statutory deadline has been found to be directory, not mandatory, thus providing no basis for invalidating actions taken in connection with the General Plan. [Citation.] Moreover, petitioners have not demonstrated that there is any substantive defect in the existing Housing Element, or shown that the project [is] inconsistent with any policies or goals stated in it." A published case holds that an expired housing element does not invalidate a general plan because the use of "shall" in Government Code section 65588 is directory, not mandatory. (San Mateo Coastal Landowners' Assn. v. County of San Mateo (1995) 38 Cal. App.4th 523, 544-545, 45 Cal.Rptr.2d 117.) This case is directly on point and was cited by Judge Cadei as the reason for rejecting the claim petitioners renew on appeal. Petitioners do not cite this case, nor discuss directory and mandatory usages of "shall" in statutes. We thus see no purpose in further discussion of this point.
*665 In a separately subheaded claim, petitioners allege that the Project is "fundamentally inconsistent" with the outdated housing element's call "for multi-family housing to meet the increased housing demands and the need for affordable housing." Counsel asserts that the Project does not have a proper "balanced mix" of multi-family and single-family housing and "by focusing on lower density housing, places the development beyond the reach of lower income individuals." Counsel has failed to mention contrary evidence, he simply throws out Project percentages and asserts that they are not good enough. For example, he states "a mere 1.6% of the total acreage" of the specific plan is devoted to medium density residences. Absent discussion of the goals of the extant (albeit outdated) housing element, and absent any explanation of why Project percentages conflict therewith, this mode of argument lacks persuasive value.
Further, the record before the County referred to a stipulated settlement, approved by Judge Tochterman in 1996, between the County, Legal Services of Northern California, and others, which sets forth a comprehensive affordable housing planning solution. The County's findings explicitly address the Project's consistency with the County's legal obligations under the settlement, finding it "meets and exceeds those targeted minimums" relating to affordable housing. Petitioners fail to mention the County's consideration of this legal obligation in their brief, and thereby again omit critical facts, forfeiting their claim of error.

DISPOSITION
The judgment is reversed with directions to the trial court to grant the petition for writ of mandate, consistent with the decision of the California Supreme Court. The parties shall bear their own costs of this appeal.
We concur: DAVIS, Acting P.J., and RAYE, J.